## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| THE DOLAN COMPANY, et al.,[1] | Case No. 14-10614 (___) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF KEVIN NYSTROM, CHIEF RESTRUCTURING OFFICER OF THE DOLAN COMPANY, IN SUPPORT OF FIRST DAY PLEADINGS

I, Kevin Nystrom, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of The Dolan Company ("Dolan"), one of the above-captioned debtors and debtors in possession (collectively, the "Debtors"). I have acted in that role since my appointment in January 2014. In my capacity as Chief Restructuring Officer, I am generally familiar with the Debtors' day-to-day operations, business affairs, and books and records, as well as the Debtors' restructuring efforts. I am above 18 years of age, and I am competent to testify.

2.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include:  The Dolan Company (4527); American Processing Company, LLC (3395); Arizona News Service, LLC (0969); assure360, LLC (8926); Counsel Press, LLC (0509); Daily Journal of Commerce, Inc. (1624); Daily Reporter Publishing Company (9860); DataStream Content Solutions, LLC (6276); Dolan APC LLC (3828); Dolan DLN LLC (3627); Dolan Media Holding Company (0186); Dolan Publishing Company (3784); Dolan Publishing Finance Company (5133); Federal News Service LLC (5309); Finance and Commerce, Inc. (2942); Idaho Business Review, LLC (6843); Lawyer's Weekly, LLC (6760); Legislative Information Services of America, LLC (4027); Long Island Business News, LLC (4338); Missouri Lawyers Media, LLC (8890); National Default Exchange Holdings, LLC (1918); New Orleans Publishing Group, L.L.C. (2405); NOPG, L.L.C. (9511); The Daily Record Company LLC (7310); and The Journal Record Publishing Co., LLC (5769).  The location of the Debtors' service address is:  222 South Ninth Street, Suite 2300, Minneapolis, Minnesota 55402.

Bankruptcy Code.    Concurrently herewith, the Debtors filed a motion seeking joint administration of these chapter 11 cases pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.    I submit this declaration (this "Declaration") to provide an overview of the Debtors, these chapter 11 cases, and the Plan (as defined herein), and to support the Debtors' chapter 11 petitions and "first day" pleadings (each, a "First Day Pleading," and, collectively, the "First Day Pleadings"). I am authorized to submit this Declaration on behalf of the Debtors. Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and information I have received from other members of the Debtors' management or the Debtors' advisors. If I were called upon to testify, I could and would testify competently to the facts set forth herein on that basis.

<strong><u>Preliminary Statement</u></strong>

4.    The Debtors comprise a diversified information management and professional services company comprised of three distinct but complementary businesses: litigation support, mortgage processing, and business and legal publishing. The Debtors provide these services through two operating divisions:   (a) the professional services division (the "Professional Services Division"); and (b) the business information division (the "Business Information Division"). The Professional Services Division provides litigation support services, including discovery management, document review, and appellate services, as well as mortgage default processing services to law firms located in Minnesota. The Business Information Division produces highly-focused legal publications, business and real estate journals, and similar content in 19 geographic markets across the United States through approximately 30 print periodicals,

2

123 specialty titles, and 96 websites.  Through its various operations, the Debtors employ approximately 602 people in various locations throughout the United States.

5.     The Debtors traditionally have enjoyed strong financial performance and have a track-record within their industry that truly separates their services from that of many of their competitors.  As discussed in more detail below, however, changes to the mortgage servicing industry over the past three years have led many large servicers of loans to slow down or reduce the referral of defaulted mortgage files to foreclosure processing services, including the mortgage processing units formerly owned by the Debtors.  More specifically, the mortgage servicing industry changed dramatically beginning in the fall of 2010 after the phenomenon known as "robo-signing" by certain other parties in the industry came to light.  Robo-signing and other alleged procedural defects, which resulted in high profile litigation regarding the mortgage foreclosure process and many new regulations governing that process, led many large servicers of loans to slow down and reduce the referral of defaulted files to foreclosure processing, instead choosing to seek alternatives to foreclosure—such as modifying and extending defaulted mortgage loans.

6.     The changes have taken a direct toll on both of the Debtors' divisions; the Professional Services Division saw a dramatic decline in foreclosure files, while the Business Information Division experienced a decline in revenue traditionally attributable to publication notice activities related to mortgage foreclosures.  The end result was a material drop in the Debtors' earnings.  Indeed, the Debtors saw their revenue sharply decline from approximately $311 million in 2010 to approximately $254 million in 2012.

7.     The Debtors' depressed earnings strained their ability to meet certain financial covenants under the Prepetition Credit Agreement (as defined herein).  The Debtors, however,

believed that the foreclosure servicing industry was poised for a comeback once the robo-signing litigation settled and new regulations were incorporated into the market.   To manage their businesses during this time and in anticipation of future returns once the mortgage processing business recovered, the Debtors initiated a number of cost-cutting measures, including effectively reducing compensation to management, exploring new sources of capital, and initiating a marketing process to consider the sale of various pieces of the Debtors' business. Despite these efforts, in June 2012, the Debtors missed their first financial covenant.   At the time, the Debtors remained hopeful that their businesses would recover so as to permit the Debtors to meet their funded debt obligations.   By March 2013, however, it became clear that the mortgage foreclosure processing business likely would not soon rebound to the pre-robo-signing levels.

8.      Since the Debtors missed their first financial covenant in June 2012 and throughout this process, the Debtors have worked productively with the lenders under the Prepetition Credit Agreement (collectively, the "Lenders") to obtain multiple waivers and amendments to maintain ordinary course operations while the parties considered potential balance-sheet solutions.   The Debtors' performance, however, has continued to suffer from the reduced demand for mortgage foreclosure services coupled with the Debtors' funded debt burden.   Having exhausted available cost-cutting and other initiatives aimed at harmonizing the Debtors' financial performance with their debt-servicing obligations, the Debtors and the Lenders began to explore more comprehensive restructuring alternatives over the course of the past few months.

9.      As discussed in more detail herein, these discussions were fruitful, and the Debtors and Lenders have reached an agreement regarding the terms of a comprehensive

4

balance-sheet restructuring pursuant to a consensual chapter 11 prepackaged plan of reorganization (the "Plan"), a copy of which is attached as **Annex II** to **Exhibit A** hereto.  Prior to commencing solicitation for votes to accept or reject the Plan, the Debtors and the Lenders memorialized the deal in a restructuring support agreement (the "Restructuring Support Agreement"), a copy of which is attached as **Exhibit A** hereto.

10.    The Plan generally provides for the following treatment of claims against and interests in the Debtors:

- in exchange for claims secured by the Prepetition Credit Agreement, the holders of such claims will receive, among other things, their *pro rata* share of (a) 100 percent of the equity in the reorganized Debtors, (b) 100 percent of the equity in a special purpose vehicle established to make distributions of the proceeds from certain of the Debtors' notes receivables, and (c) a take-back term loan in an amount that will be no greater than $50 million and will be entered into with the reorganized Debtors as part of the Debtors' exit facilities;

- holders of general unsecured claims will "ride through" the chapter 11 process unaffected;[2] and

- existing preferred and common equity interests in Dolan will be cancelled without any distribution to holders of such interests.

11.    In addition, pursuant to the Restructuring Support Agreement, the Lenders committed to fund a postpetition debtor-in-possession financing facility to fund the Debtors' operations during these chapter 11 cases, as well as exit financing on a post-emergence basis to ensure that the reorganized balance sheet is appropriately capitalized.  This financial support also further demonstrates the Lenders' faith in the Debtors' future growth prospects after the Debtors are able to right-size their balance sheet.

---

[2]    As set forth herein, the Debtors are seeking first-day relief to continue honoring general unsecured claims in the ordinary course of business throughout these cases, thus ensuring that the contemplated balance-sheet restructuring will have no impact on the Debtors' day-to-day creditors.

KE 29888458

12.     The Debtors filed these chapter 11 cases to effectuate the transactions contemplated by the Plan and the Restructuring Support Agreement. After the consummation of these restructuring transactions, the Debtors outstanding indebtedness will be reduced by more than $100 million and will total approximately $50 million. These restructuring transactions will therefore substantially delever the Debtors' balance sheet to provide the reorganized Debtors and DiscoverReady with stability and financial flexibility to grow their businesses going forward. The Debtors' believe that the Plan is in the best interests of these estates and should be confirmed.

13.     To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these chapter 11 cases, this Declaration is organized in three parts. Part I describes the Debtors' business and their capital structure. Part II details the circumstances surrounding the commencement of these chapter 11 cases. Part III sets forth the relevant facts in support of each of the First Day Pleadings filed in connection with these chapter 11 cases.

## Part I.
## General Background

**I.     The Debtors' Businesses.**

14.     Dolan, the Debtors' ultimate parent company, is a publicly held Delaware corporation operating through its two primary divisions, the Business Information Division and the Professional Services Division. The Professional Services Division, in turn, provides two distinct services, (a) legal support services (the "Legal Support Services") and (b) mortgage default processing services (the "Mortgage Default Processing Services"). In the twelve months ended December 31, 2013, the Debtors and DiscoverReady generated revenues totaling approximately $158 million on a consolidated basis (excluding intercompany revenues).

15.     Dolan was incorporated in March 2003 under the name DMC II Company to continue operations started in 1992 under the name Dolan Media Company by Dolan's current Chief Executive Officer, James P. Dolan.  Dolan resumed operations under the name Dolan Media Company in July 2003 after Dolan Media Company spun off its business information and other businesses to Dolan in connection with a restructuring, and subsequently changed its name to The Dolan Company in May 2010.

16.     Initially founded as a publishing company, the Debtors' operations have grown over the past two decades to include discovery management, document review, legal appeal, and mortgage processing services and software.  The Debtors' growth led to, among other things, Dolan conducting an initial public offering on August 2, 2007, at which time Dolan's shares began trading on the New York Stock Exchange under the ticker symbol "DM."[3]  Each of the Debtors' various business units are discussed more fully in turn.

### A.     The Business Information Division.

17.     The Debtors' Business Information Division, which includes approximately 30 print periodicals, 123 specialty titles, and 96 websites, provides important sources of news and information for the legal, financial, government, and real estate sectors in 19 markets in the United States.  The Business Information Division also operates specialized information services covering legislative and regulatory activities and provides transcription, media monitoring, and translation services.  The Business Information Division's products focus on industry dynamics, recent transactions in the relevant market, and current and potential client opportunities, and provide news, insight, and commentary designed for legal, financial, real estate, and government professionals.  The Business Information Division also organizes conferences and events for the

---

[3]     Dolan was delisted from the New York Stock Exchange in February 2014.

KE 29888458

various specialized industries that it serves.   In addition, the Business Information Division organizes conferences and events for the various specialized industries that it serves.   The Business Information Division currently employs approximately 467 employees, 13 of whom are represented by 3 separate unions.   For the year ending December 31, 2013, the Business Information Division accounted for 79 percent of the Debtors' total revenues.

>  **B.**      **The Professional Services Division.**

>>       **1.**      **Litigation Support Services.**

18.      The Debtors' Litigation Support Services businesses provide (a) appellate services to local and regional law firms and (b) outsourced litigation support to major national and international companies, their in-house lawyers, and law firms.   The Debtors provide these services through two divisions, Counsel Press LLC ("Counsel Press"), which the Debtors wholly own, and DiscoverReady, in which the Debtors own a 90.1 percent equity interest.

19.      Counsel Press assists law firms in organizing, preparing, and filing appellate briefs, records, and appendices.   Counsel Press currently employs 84 employees.   For the year ending December 31, 2013, Counsel Press accounted for 18 percent of the Debtors' total revenues.

20.      DiscoverReady provides discovery management and document review services, including certain technology services related to processing and hosting discovery data. DiscoverReady currently employs 176 employees, and had total revenues of $71.2 million for the year ending December 31, 2013.   As discussed more fully in the Debtors' disclosure statement in support of its Plan, filed contemporaneously herewith, the Debtors' equity interest in DiscoverReady—which is subject to the Lenders' valid and perfected prepetition liens—will be transferred to the Lenders on the Effective Date pursuant to the Plan.

KE 29888458

### 2.    Mortgage Default Processing Services.

21.    The Debtors were formerly a major provider of mortgage default processing and related services to law firms, mortgage lenders, and loan servicers through its Dolan APC LLC subsidiary (collectively with its subsidiaries, "Dolan APC").  Dolan APC historically assisted law firms and other customers in processing foreclosure, bankruptcy, eviction, and, to a lesser extent, litigation and other mortgage default related case files, in connection with residential mortgage defaults in California, Florida, Georgia, Indiana, Michigan, Minnesota, Nevada, and Texas.  Through a series of asset and equity sales, the Debtors sold their Florida operations in 2012 and their California, Florida, Georgia, Indiana, Michigan, Nevada, and Texas operations in the third quarter of 2013.[4]  Dolan APC's remaining operations provide mortgage default processing and related services to one law firm customer located in Minnesota.  In addition, assure360 LLC, an entity that is part of the Debtors' Mortgage Default Processing Services business, operates data centers and case and document management systems for the mortgage default processing industry.  The Mortgage Default Processing Services business currently employs 49 employees.  For the quarter ending December 31, 2013, after all of Dolan APC's non-Minnesota operations were sold, the Mortgage Default Processing Services accounted for less than one percent of the Debtors' total revenues.

### C.    Administration.

22.    The Debtors' administrative services are centrally provided to all of the Debtors' business units from Dolan's headquarters in Minneapolis, Minnesota, where Dolan employs approximately 75 employees, including the Debtors' senior management.  The administrative

---

[4]    Importantly, the Debtors believe that the estimated principal balance of the notes receivable received as consideration under the purchase agreements for Dolan APC's former operations will be approximately $12.3 million as of June 30, 2014.  The Lenders have a valid and perfected lien on all such notes receivable.  Pursuant to the Plan, such note receivables will be owned by the Seller Notes SPV (as defined in the Plan) upon consummation of the Plan.

KE 29888458

services provided by Dolan to its subsidiaries include accounting and finance, human resources, information technology, and legal services. A portion of the costs for these services are allocated for accounting purposes among each of the Debtors.

## II. The Debtors' Corporate and Capital Structure.

23.    The Debtors' corporate structure chart as of the Petition Date is depicted on the chart attached hereto as **Exhibit B**. As set forth above and on **Exhibit B**, Dolan is a publicly traded company and has approximately 30.2 million of outstanding shares of common stock, which shares have a value of approximately $4.5 million based on trading prices as of the date hereof, and has approximately 700,000 outstanding shares of 8.5 percent Series B Cumulative Preferred Stock, which shares have a value of approximately $2.1 million based on trading prices as of the date hereof. Dolan directly or indirectly wholly-owns all of its subsidiaries other than: (a) DiscoverReady, in which DR Holdco LLC owns a 9.9 percent interest; (b) Mid Atlantic Real Estate Media L.L.C., in which Dolan indirectly owns 10 percent; (c) Detroit Legal News Publishing, LLC, in which Dolan indirectly owns 35 percent; and (d) Bring Me The News, LLC, in which Dolan indirectly owns 13 percent. None of Dolan's non-wholly owned subsidiaries is a Debtor in these chapter 11 cases.

24.    As of the Petition Date, the Debtors' consolidated funded debt obligations totaled approximately $153.5 million, and consisted of, among other things, approximately $116.5 million outstanding under their prepetition term loan facility and approximately $37 million outstanding under their prepetition revolving loan facility, both issued pursuant to the Prepetition Credit Agreement. In addition, the Debtors have obligations related to two interest rate swaps that are secured under the Prepetition Credit Agreement. The primary components of the Debtors' consolidated funded debt obligations are described below.

KE 29888458

### A.    The Prepetition Credit Agreement.

25.    The Debtors are party to that certain Third Amended and Restated Credit Agreement (as amended, modified, or supplemented from time to time, the "Prepetition Credit Agreement"), dated as of December 6, 2010, by and between Dolan, the other Borrowers party thereto, and Bayside Capital, Inc., as successor administrative agent for the Lenders (the "Administrative Agent"), and the Lenders party thereto.    Pursuant to the Prepetition Credit Agreement, Dolan initially became the borrower with respect to (a) a $155 million revolving credit facility and (b) a $50 million term loan facility.    The Debtors' obligations under the Prepetition Credit Agreement are secured by first-priority liens and security interests on substantially all of the Debtors' real and personal property (the "Collateral").    Each of the Debtors and DiscoverReady is a co-borrower under the Prepetition Credit Agreement.    As of the Petition Date, the amount outstanding under the Prepetition Credit Agreement is approximately $153.5 million.

26.    The Prepetition Credit Agreement has been amended eleven times to, among other things, provide the Debtors with flexibility to issue preferred shares and sell assets as well as to provide the Debtors with the liquidity, performance covenants, and waivers necessary to allow the Debtors to operate their businesses.    Among other amendments, on October 5, 2012, pursuant to that certain Third Amendment to the Third Amended and Restated Credit Agreement, the Debtors converted $100 million originally issued pursuant to the revolving credit facility to debt under the term loan facility and reduced the amount available under the revolving credit facility to $65 million.

27.    More recently, the Debtors and the Lenders have been focused on restructuring the Debtors' operations and debt.    To that end, on October 31, 2013, the Debtors, DiscoverReady, the Lenders, and the Administrative Agent entered into that certain Consent,

11

Waiver and Sixth Amendment to the Third Amended and Restated Credit Agreement (the "Sixth Amendment"). The Sixth Amendment, among other things: (a) reduced the amount available to the Debtors under the revolving credit facility to $40 million, with scheduled step-downs over the remaining term of the revolving credit facility; (b) amended the termination date of the credit facility from December 6, 2015, to December 31, 2014; (c) consolidated the Debtors' interests in Dolan APC; (d) amended certain financial covenants; and (e) required the Debtors to complete one or more transactions by March 31, 2014, sufficient to raise at least $50 million in cash to prepay the term loan facility.

28.    On January 7, 2014, the Debtors, DiscoverReady, the Lenders, and the Administrative Agent entered into that certain Limited Waiver, Consent and Seventh Amendment to the Third Amended and Restated Credit Agreement (the "Seventh Amendment"). The Seventh Amendment, among other things, required the Debtors to: (a) appoint a chief restructuring officer; (b) provide weekly delivery of a 13-week cash flow forecast and have weekly conferences between the Lenders and the chief restructuring officer; and (c) enter into a term sheet for a proposed restructuring in a form satisfactory to the holders of 51 percent of the outstanding indebtedness issued pursuant to the Prepetition Credit Agreement by the date that was 14 days after the Debtors and their advisors received an initial draft term sheet from the Lenders.

29.    On February 13, 2014, the Debtors, DiscoverReady, the Lenders, and the Administrative Agent entered into that certain Limited Waiver, Consent and Eighth Amendment to the Third Amended and Restated Credit Agreement (the "Eighth Amendment"), pursuant to which, the Debtors agreed to, among other things: (a) pay a fee of 5 percent of the amount of outstanding indebtedness under the Prepetition Credit Agreement; (b) enter into a restructuring

term sheet with the Lenders on or before February 20, 2014 (which date was subsequently extended to March 7, 2014 pursuant to the ninth and tenth amendments to the Prepetition Credit Agreement); and (c) the Lenders' temporary waiver of actual and asserted defaults under the Prepetition Credit Agreement, which waiver expires on February 28, 2014 (which date was subsequently extended to March 7, 2014 pursuant to the tenth amendment to the Prepetition Credit Agreement), unless extended by written consent of the Lenders holding at least 51 percent of the outstanding indebtedness issued pursuant to the Prepetition Credit Agreement (the "Required Lenders"). In exchange, the Lenders agreed to increase the availability under the revolving credit facility by $3.9 million.

**B.    The Swap Agreements.**

30.    The Debtors are parties to an interest rate swap agreement with Bank of America, N.A., pursuant to that certain ISDA 2002 Master Agreement, dated December 22, 2009 (the "Swap Agreement"). The Debtors' obligations under the Swap Agreement is secured by the liens on the Collateral securing the Debtors' obligations under the Prepetition Credit Agreement, which liens are *pari passu* with the Lenders' liens. The total exposure arising in the event of termination of the Swap Agreement was estimated solely for purposes of voting to accept or reject the Plan at $311,298.00. Additionally, the Debtors were formerly parties to an interest rate swap agreement with Wells Fargo Bank, N.A., which was terminated by the parties on March 14, 2014, for a termination fee of $141,400.00.

**Part II.**
**Events Leading to the Chapter 11 Cases**

**I.    The Debtors' Business Model.**

31.    The Debtors have historically had a cash flow positive business. In fact, the Debtors had experienced almost 20 years of uninterrupted growth before events in the mortgage

13

industry created significant disruptions for the Debtors' business model. The Debtors' growth was based on its unique business model, which was designed to generate revenues and cash flow throughout all phases of the economic cycle with cyclical revenues and cash flows from the Business Information Division and Litigation Support Services businesses balanced against counter-cyclical revenues and cash flows generated by the Mortgage Default Processing Services businesses. Before the fall of 2010, this business model proved successful in allowing the Debtors' businesses to grow even during a deep recession due to the volume of mortgage loan delinquencies and defaults. Indeed, in the Debtors' best year, 2010, their revenue was approximately $311 million. And, given the success of this business model, the Debtors entered into the Prepetition Credit Agreement in December 2010, under which funded debt obligations were in line with the Debtors' business model up to that time.

## II.    Events in the Mortgage Industry.

32.    The Debtors' business operations first encountered financial difficulties in the fall of 2010 due to changes in the mortgage industry. In September 2010, the national media brought attention to the fact that certain lending institutions, including several large financial institutions, were, among other things, foreclosing on homes in instances where the foreclosure documents were executed without verifying the information contained in such foreclosure documents, a phenomenon that came to be known as "robo-signing." The intense national attention that followed led most large banks, including J.P. Morgan Chase & Co., Bank of America Corporation, and Wells Fargo & Company, to suspend judicial and non-judicial foreclosures across the United States while they reviewed their mortgage foreclosure practices. In the aftermath of the "robo-signing" revelations, various federal, state, and local governments proposed new regulations for the mortgage industry and each state and the federal government reached settlements with the five largest mortgage servicer institutions whereby such institutions

14

agreed to provide $26 billion in direct relief to distressed homeowners and in payments to state and federal governments. Given the scale of the issues that arose from "robo-signing," many financial institutions have instituted new procedures for distressed loan situations, where such institutions favor negotiated loan modifications, principal reductions, and short sales rather than foreclosures, and in instances where such institutions do foreclose, they do so through lengthier procedures put in place in order to comply with new regulations.

33.     These marketplace dynamics had a tremendous negative impact of the Debtors' businesses. Specifically, the changes in the mortgage services industry had an adverse impact on, among other things: (a) the number of mortgage default case files the Debtors were asked to process; (b) the length of time and amount of work to process such files; (c) the time over which the Debtors recognized revenue associated with the processing of those files; and (d) the margins on the Debtors' services. Simply put, the Debtors' costs associated with the mortgage foreclosure process increased at the same time that the amount of such work significantly dropped.

34.     The changes in the mortgage market also had a negative impact on the Debtors' other business activities. Specifically, the slower foreclosure referral pace led to a decline in public notice revenue within the Business Information Division, which undercut an important revenue stream at the same time that the Business Information Division was otherwise successfully focused on increasing revenues from websites to counterbalance the drop in print circulation affecting most publications. In addition, concerns regarding the Debtors' overall financial health caused the Debtors' largest client for its Litigation Support Services businesses to curtail its relationship with the Debtors, pending a long-term solution to the Debtors' financial

15

issues. The Debtors' lost revenue resulting from the decline in the mortgage foreclosure industry led the Debtors to miss their first financial covenant in June 2012.

## III.    Out-of-Court Restructuring Initiatives.

35.    Even though the Debtors had missed a financial covenant, the Debtors believed that their operations would improve after the Mortgage Default Processing Services business returned to pre-September 2010 levels, which, given the continuing backlog of residential loan defaults, the Debtors believed would occur after the major robo-signing litigation was settled and new regulations were in place. The Debtors therefore took steps to right size their balance sheet and reduce operational costs as they attempted to manage through these difficulties, including, among other things, effectively reducing management compensation and raising $15 million through the issuance of preferred shares.

36.    The Debtors and the mortgage foreclosure industry continued to expect residential mortgage foreclosures to significantly increase each time a major mortgage-foreclosure related litigation settled, such as the global settlement with forty-nine states' attorneys general in 2012 or the federal government's settlements with twelve large financial institutions for approximately $9 billion in 2013, and as mortgage foreclosure processes became more uniform due to the National Servicing Standards. But by March 2013, it became evident that the Mortgage Default Processing Services Business likely would not soon rebound to 2010 levels. The Debtors consequently took further steps to turnaround their operations and meet their funded debt obligations. To that end, the Debtors sold substantially all of the Mortgage Default Processing Services businesses in 2013. Importantly, selling these operations eliminated negative cash flows from these businesses, while providing the Debtors with cash to reduce their debt load as well as a more predictable cash flow in the future based on expected earn outs due under the various purchase agreements. Moreover, the sale of the mortgage processing businesses has

16

allowed the Debtors to focus their operations on the core segments of their Business Information and Professional Services Divisions.

37.     The Debtors also took steps to sell other business units as part of their restructuring efforts.  To that end, the Debtors marketed certain of the Business Information Divisions' assets and, in 2013, sold two business journals and related assets in certain non-essential markets.  In addition, in July 2013, the Debtors' Board of Directors authorized the Debtors to market DiscoverReady.  Over the course of approximately 6 months, the Debtors actively marketed DiscoverReady.  Ultimately, however, the Debtors did not proceed with a sale of DiscoverReady.

38.     All told, the Debtors' multiple restructuring efforts were successful in reducing the Debtors' funded debt load by more than $40 million over the course of the Debtors' prepetition restructuring efforts.  The Debtors' performance, however, has continued to suffer from the reduced demand for mortgage foreclosure services coupled with the Debtors' funded debt burden.  Having exhausted available cost-cutting and other initiatives aimed at harmonizing the Debtors financial performance with their debt-servicing obligations, the Debtors and the Lenders began to explore more comprehensive restructuring alternatives over the course of the past several months.

## IV.     Plan Negotiations.

39.     In late 2013, the Debtors and the Lenders entered into active negotiations regarding a restructuring transaction or transactions that would reduce the Debtors' outstanding debt obligations and provide for a maximum recovery for all of the Debtors' stakeholders.  As part of this process, the Debtors and the Lenders amended the Prepetition Credit Agreement in order to provide the Debtors with the necessary liquidity to fund operations while at the same time working with the Lenders on a comprehensive restructuring.

KE 29888458

40.     These discussions were ultimately successful, culminating in an agreement in principle among the Debtors, DiscoverReady, DR LenderCo LLC, the Lenders, and certain swap counterparties regarding the terms of a balance sheet restructuring, which the parties committed to documenting and consummating in early 2014.  This agreement in principle clears the way for the Debtors to consummate a debt-for-equity transaction that will transfer ownership of the Debtors to the Lenders and prevent the Debtors from defaulting under the Prepetition Credit Agreement, which would have enabled the Lenders to exercise remedies against the Debtors' and DiscoverReady's assets to the detriment of the Debtors' other stakeholders.

41.     The parties' efforts resulted in a global resolution—memorialized in the Restructuring Support Agreement—that serves as the foundation for these chapter 11 cases and the Plan.  The Debtors believe that the Plan is in the best interests of their estates and should be confirmed.  Generally, the Plan provides, among other things, that:[5]

- in exchange for the claims secured by the Prepetition Credit Agreement, (a) the Debtors and the holders of claims secured by the Prepetition Credit Agreement shall enter into the Reorganized Dolan Term Loan, (b) the holders of claims secured by the Prepetition Credit Agreement shall be issued 100 percent of the Reorganized Equity, subject to dilution on account of the Lender Newco Distribution, and (c) the holders of claims secured by the Prepetition Credit Agreement shall receive 100 percent of the SPV Interests;

- in further exchange for the claims secured by the Prepetition Credit Agreement, (a) reorganized Dolan will distribute its membership interest in DiscoverReady to New Topco and (b) Lender Newco, which holds the Lenders' 9.9 percent membership interest in DiscoverReady, shall merge into New Topco; upon consummation of these transactions, New Topco shall become the 100 percent owner of DiscoverReady;

- all outstanding and undisputed general unsecured claims against the Debtors will be unimpaired and unaffected by the restructuring and will be paid in full in cash; and

---

[5]   Capitalized terms used but otherwise not defined in this summary of the Plan shall have the meanings ascribed to such terms in the Plan.

- all existing interests in Dolan will be cancelled and will receive no distribution.

42.     The Debtors also believe that the other terms of the Restructuring Support Agreement, including the restructuring of DiscoverReady, are in the best interests of their estates.   Pursuant to the Restructuring Support Agreement, the Lenders will release DiscoverReady from any and all obligations or claims arising under or related to the Prepetition Credit Agreement upon the effective date of the Debtors' Plan and will provide DiscoverReady with a new $10 million unfunded revolving credit facility to support its going-forward operations.   Pursuant to these transactions, DiscoverReady shall remain an entity separate and distinct from the reorganized Debtors.

43.     After the consummation of the restructuring transactions set forth in the Plan and the Restructuring Support Agreement, the Debtors outstanding indebtedness will be reduced by more than $100 million and will total approximately $50 million.   The Debtors believe that these transactions will provide the Debtors with the stability and financial flexibility to grow their businesses going forward, and are therefore in the best interests of their estates.

44.     The Debtors documented the Plan and solicited acceptances and rejections of the Plan pursuant to section 1126(b) of the Bankruptcy Code prior to commencing these chapter 11 cases. Each party that submitted a vote on the Plan voted to accept the Plan. The Debtors have requested that the Court schedule a hearing to confirm the Plan on May 1, 2014, in the *Debtors' Motion for Entry of an Order (A) Scheduling a Combined Disclosure Statement Approval and Confirmation Hearing, (B) Establishing a Plan Confirmation Objection Deadline and Related Procedures, (C) Approving the Solicitation Procedures, (D) Approving the Confirmation Hearing Notice and the Cure Notice, (E) Directing That a Meeting of Creditors Not Be Convened, and (F) Granting Related Relief* (the "Solicitation Motion"), filed contemporaneously

19

herewith.  The following table sets forth the Debtors' proposed timeline for these chapter 11 cases and confirmation of the Plan:[6]

| Event | Date |
|---|---|
| Voting Record Date | March 18, 2014 |
| Distribution of Solicitation Package | March 18, 2014 |
| Voting Deadline | March 21, 2014, at 5:00 p.m. (prevailing Pacific Time) |
| Distribution of Confirmation Hearing Notice | March 27, 2014, or such other date as the Court may direct |
| Publication of Publication Notice | April 1, 2014, or such other date as the Court may direct |
| Objection Deadline | April 24, 2014, at 5:00 p.m., prevailing Eastern Time, or such other date as the Court may direct |
| Deadline to Reply Brief | April 29, 2014, at 11:00 a.m., prevailing Eastern Time, or such other date as the Court may direct |
| Confirmation Hearing | May 1, 2014, or such other date as the Court may direct |

**Part III.**
**First Day Pleadings.**[7]

45.    Contemporaneously herewith, the Debtors have filed a number of First Day Pleadings in these chapter 11 cases seeking orders granting various forms of relief intended to stabilize the Debtors' business operations, facilitate the efficient administration of these chapter 11 cases, and expedite a swift and smooth restructuring of the Debtors' balance sheet.  I believe that the relief requested in the First Day Pleadings is necessary to allow the Debtors to

---

[6]   Capitalized terms used but not otherwise defined in this table shall have the meanings ascribed to them in the Solicitation Motion.

[7]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the respective First Day Pleadings.

KE 29888458

operate with minimal disruption during the pendency of these chapter 11 cases.  A description of

the relief requested and the facts supporting each of the First Day Pleadings is set forth below.

## I.    Administrative and Procedural Pleadings.

### A.    Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion").

46.    Pursuant to the Joint Administration Motion, the Debtors seek entry of an order,

(a) directing procedural consolidation and joint administration of these chapter 11 cases, and

(b) granting related relief.  Specifically, the Debtors request that the Court maintain one file and

one docket for all of the chapter 11 cases under the case of The Dolan Company.  Further, the

Debtors request that an entry be made on the docket of each of the chapter 11 cases of the

Debtors other than The Dolan Company to indicate the joint administration of the chapter 11

cases.

47.    Given the integrated nature of the Debtors' operations, it is my understanding that

joint administration of these chapter 11 cases will provide significant administrative convenience

without harming the substantive rights of any party in interest.  Many of the motions, hearings,

and orders in these chapter 11 cases will affect each and every Debtor entity.  The entry of an

order directing joint administration of these chapter 11 cases will reduce fees and costs by

avoiding duplicative filings and objections.  Joint administration also will allow the Office of the

United States Trustee for the District of Delaware and all parties in interest to monitor these

chapter 11 cases with greater ease and efficiency.

48.    I believe that the relief requested in the Joint Administration Motion is in the best

interests of the Debtors' estates, their creditors, and all other parties in interest and will enable

the Debtors to continue to operate their businesses in chapter 11 without disruption.

KE 29888458

Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Joint Administration Motion should be granted.

**B.** **Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. § 156(c) Approving the Retention and Appointment of Kurtzman Carson Consultants LLC as Claims and Noticing Agent for the Debtors, Effective *Nunc Pro Tunc* to the Petition Date ("KCC Retention Application").**

49.     Pursuant to the KCC Retention Application, the Debtors seek entry of an order, (a) approving the services agreement between the Debtors and Kurtzman Carson Consultants LLC ("KCC") and the Debtors' appointment and retention of KCC as claims and noticing agent for the Debtors in lieu of the Clerk of the United States Bankruptcy Court for the District of Delaware, effective *nunc pro tunc* to the Petition Date, and (b) granting related relief.   The Debtors will have thousands of potential creditors in these chapter 11 cases.   Accordingly, KCC's engagement is an effective and efficient manner of providing notice to the thousands of creditors and parties in interest of the filing of and developments in the Debtors' chapter 11 cases.   Additionally, KCC will significantly reduce the administrative burden on the clerk's office in connection with, among other things, the claims administration process.   It is my understanding that KCC is fully equipped to handle the volume of mailing involved in properly sending the required notices to creditors and other interested parties in these chapter 11 cases and processing the claims filed in the Debtors' cases.   Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the KCC Retention Application should be granted.

**C.** **Debtors' Motion for Entry of an Order Authorizing the Debtors to File a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor ("Creditor Matrix Motion").**

50.     Pursuant to the Creditor Matrix Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor, and (b) granting related relief.   The Debtors propose to retain

KCC as notice and claims agent in connection with the Debtors' chapter 11 cases to assist the Debtors in preparing creditor lists and mailing initial notices. With such assistance, the Debtors will be prepared to file a computer-readable consolidated list of creditors upon request and will be capable of undertaking all necessary mailings. Indeed, because the Debtors have thousands of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors or their agents.

51.     I believe that consolidation of the Debtors' computer records into a creditor database and mailing notices to all applicable parties in such database will be sufficient to permit KCC to promptly notice those parties. Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and accuracy and reduce costs. Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Creditor Matrix Motion should be granted.

**II.     Operational Motions Requesting Immediate Relief.**

    **A.     Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Maintain Existing Business Forms, and (D) Continue to Perform Intercompany Transactions and (II) Granting Related Relief ("Cash Management Motion").**

52.     Pursuant to the Cash Management Motion, the Debtors seek entry of an order, (a) authorizing the Debtors to (i) continue to operate the Cash Management System, (ii) honor certain prepetition obligations related thereto, (iii) maintain existing business forms, and (iv) continue to perform Intercompany Transactions, and (b) granting related relief. The Debtors and DiscoverReady maintain an integrated Cash Management System as part of the ordinary

course of their businesses that allows them to efficiently and effectively manage their funds and financial affairs.  This Cash Management System is similar to those utilized by other large companies that operate in numerous locations.  Any disruption to the Cash Management System would have an immediate and adverse effect on the Debtors' businesses.

53.    The Debtors use their Cash Management System in the ordinary course of their business to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' accounting department maintains daily oversight over the Cash Management System and implement cash management controls for entering, processing, and releasing funds, including in connection with intercompany transactions.  Additionally, the Debtors' corporate accounting, cash forecasting, and internal audit departments regularly reconcile the Debtors' books and records to ensure that all transfers are accounted for properly.

54.    The Cash Management System is comprised of approximately 24 bank accounts at various financial institutions.    The Cash Management System is designed to effectively manage the inflow of revenue and disbursements for operating expenses.    It is critical that the Cash Management System remains intact to ensure seamless payments to vendors and continued collection of revenues for the Debtors' estates.

55.    In the ordinary course of business, the Debtors and DiscoverReady maintain business relationships with each other resulting in intercompany receivables and payables in the ordinary course of business.  Such Intercompany Transactions are limited to the sharing of corporate overhead and payroll expenses.  Some of these costs are allocated among the Debtors by headcount and others are allocated by revenue share.

KE 29888458

56.     The Debtors track all fund transfers in their respective accounting systems and can ascertain, trace, and account for all Intercompany Transactions.  The Debtors, with their advisors, have also put in place monitoring systems to be able to track postpetition intercompany transfers.  If the Intercompany Transactions were to be discontinued, the Cash Management System and the Debtors' operations would be disrupted unnecessarily to the detriment of the Debtors and their creditors and other stakeholders.

57.     In the ordinary course of business, the Banks charge, and the Debtors pay, honor, or allow the deduction from the appropriate account, certain service charges, and other fees, costs, and expenses.  Historically, it is my understanding that the Debtors estimate that they pay approximately $25,000 in Bank Fees each month, depending on transaction volume.  I also understand that there are approximately $20,000 in prepetition Bank Fees outstanding as of the Petition Date.  To maintain the integrity of their Cash Management System, the Debtors request authority to pay the Prepetition Bank Fees, in addition to any other prepetition Bank Fees for prepetition transactions that are charged postpetition, and to continue to pay the Bank Fees in the ordinary course of business postpetition.  The Debtors also request that their banks be authorized to charge-back returned items to the Bank Accounts, whether such items are dated before, on, or subsequent to the Petition Date, in the ordinary course of business.

58.     As part of their Cash Management System, the Debtors utilize numerous preprinted business forms in the ordinary course of their business.  The Debtors also maintain books and records to document, among other things, their profits and expenses.  To minimize expenses to their estates and avoid confusion on the part of employees, customers, vendors, and suppliers during the pendency of these chapter 11 cases, the Debtors request that the Court authorize their continued use of all correspondence and business forms (including, without

limitation, letterhead, purchase orders, invoices, and preprinted checks) as such forms were in existence immediately before the Petition Date, without reference to the Debtors' status as debtors in possession, rather than requiring the Debtors to incur the expense and delay of ordering entirely new business forms as required under the U.S. Trustee Guidelines.

59.     Given the complexity of the Debtors' business operations, I believe that any disruption to the Cash Management System could impede a successful reorganization of the Debtors' businesses.  I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates and will enable the Debtors to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**B.     Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Pay General Unsecured Claims in the Ordinary Course of Business, (B) Granting Administrative Expense Priority to All Undisputed Obligations on Account of Outstanding Orders, and (C) Granting Related Relief ("All GUC Motion").**

60.     Pursuant to the All GUC Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay General Unsecured Claims in the ordinary course of business, (b) granting administrative expense priority to all undisputed obligations on account of Outstanding Orders and authorizing the Debtors to satisfy such obligations in the ordinary course of business, and (c) granting related relief.  For the reasons set forth below, I believe that the relief requested in the All GUC Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in the ordinary course without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the All GUC Motion should be approved.

KE 29888458

1.    **The General Unsecured Claims.**

61.    In the ordinary course of business, the Debtors incur obligations to a variety of General Unsecured Creditors, including:    (a) employees;    (b) utilities;    (c) insurers; (d) governmental authorities; (e) printing companies; (f) suppliers of paper, ink, and other goods related to print production; (g) physical and electronic records storage providers; (h) information technology equipment suppliers; (i) publication delivery couriers; (j) web hosting services; (k) real estate and equipment lessors; (l) postal services vendors; (m) ordinary course service providers; and (n) numerous other trade vendors that provide goods and services that are necessary for the operation of the Debtors' businesses.    The Debtors estimate that, as of the Petition Date, they owe approximately $10.3 million to General Unsecured Creditors on account of undisputed prepetition General Unsecured Claims.    Of that amount, approximately $6.0 million relates to claims the Debtors are seeking authority to pay pursuant to other traditional chapter 11 first-day pleadings.    Pursuant to the All GUC Motion, the Debtors are seeking authority to pay undisputed General Unsecured Claims as they become due and payable in the ordinary course of business, not to accelerate the timing of payments to any holder of a General Unsecured Claim.

62.    I believe that paying undisputed General Unsecured Claims in the ordinary course of business is reasonable because the General Unsecured Claims are unimpaired under the Plan. The relief requested in the All GUC Motion therefore merely expedites distributions to holders of General Unsecured Claims that would otherwise be made at a later date under the Plan,[8]

---

[8]    Furthermore, I understand that pursuant to section 503(b)(9) of the Bankruptcy Code, certain of the General Unsecured Claims would be entitled to administrative expense priority, meaning that a chapter 11 plan must pay such claims in full in order to be confirmed.

minimizing any gratuitous disruption to the Debtors' businesses and allowing for a smooth and expeditious reorganization in these chapter 11 cases.

63.     Conversely, I believe that delaying payment of General Unsecured Claims beyond normal practices could seriously damage the Debtors' going concern value by undermining the "business as usual" message that serves as a cornerstone to these prepackaged chapter 11 cases. Indeed, I believe that any such delay could cause an immediate loss of trade credit resulting in a liquidity crisis and, short of that, the loss of favorable payment terms when negotiating upcoming contract renewals and future orders with important vendors. Furthermore, the Debtors' vendors often either are the sole source or one of a handful of sources able to provide the good or service used by the Debtors in their business operations, and many are not parties to contracts with the Debtors.

64.     Moreover, paying the General Unsecured Claims in the ordinary course of business should not create an imbalance in the Debtors' cash flows because substantially all of the General Unsecured Claims have customary payment terms and will not be payable immediately. To the extent such claims become payable, cash generated in the ordinary course of business, together with the proposed debtor-in-possession financing facility, will provide the Debtors with sufficient liquidity to pay the undisputed General Unsecured Claims.

### 2.     The Outstanding Orders.

65.     Prior to the Petition Date, and in the ordinary course of business, the Debtors may have ordered goods that will not be delivered until after the Petition Date (the "Outstanding Orders"). In the mistaken belief that they would be general unsecured creditors of the Debtors' estates with respect to such goods, I believe that certain suppliers may refuse to ship or transport such goods (or may recall such shipments) with respect to such Outstanding Orders unless the Debtors issue substitute purchase orders postpetition—potentially

disrupting the Debtors' ongoing business operations and requiring the Debtors' to expend substantial time and effort in issuing such substitute orders.  In order to avoid such needless harms, I believe that the Outstanding Orders should be granted administrative expense priority and that the Debtors should be authorized to pay amounts due on account of Outstanding Orders in the ordinary course of business.

> **C.**  **Debtors' Motion for Entry of an Order (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Expenses, (B) Continue Ordinary Course Incentive Programs for Non-Insiders, and (C) Continue Employee Benefits Programs and (II) Granting Related Relief ("Wages Motion").**

66.    Pursuant to the Wages Motion, the Debtors seek entry of an order, (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, (ii) continue incentive programs for non-insiders in the ordinary course and in a manner consistent with the Debtors' prepetition practices, and (iii) continue and/or modify employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, and (b) granting related relief.

67.    It is my understanding that the Debtors collectively employ approximately 603 individuals on a full-time basis across twenty-six states. Of the Debtors' employees, approximately 13 employees are represented by three separate collective bargaining units.  In addition, the Debtors supplement their business needs and workforce with approximately 300 independent contractors and a number of temporary staff annually, who typically perform a wide range of services critical to the Debtors' operations.  I believe the Debtors' employees perform a wide variety of functions critical to the administration of these chapter 11 cases and the Debtors' successful reorganization.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.

KE 29888458

68.    I believe the vast majority of the Debtors' employees rely exclusively on their compensation and benefits to pay their daily living expenses and support their families.  Thus, employees will be exposed to significant financial constraints if the Debtors are not permitted to continue paying their employees compensation, providing their employees benefits, and maintaining certain programs benefiting their employees.  Moreover, if the Debtors are unable to satisfy such obligations, employee morale and loyalty will be jeopardized at a time when employee support is critical.  In the absence of such payments, I believe that the Debtors' employees may seek alternative employment opportunities.  Further, it is my opinion that loss of valuable employees and the recruiting efforts that would be required to replace such employees would be distracting at a time when the Debtors should be focused on maintaining operations.

69.    I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption so as to avoid immediate and irreparable harm to the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Wages Motion should be granted.

**D.    Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Continue Customer Programs and Honor Prepetition Commitments Related Thereto and (B) Granting Related Relief ("Customer Programs Motion").**

70.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to honor prepetition obligations to customers and to continue customer-related programs and practices (collectively, the "Customer Programs") in the ordinary course of business, and (b) granting related relief.

71.    In the ordinary course of business, the Debtors offer Customer Programs that are intended to engender goodwill, maintain customer loyalty, increase the Debtors' sales

KE 29888458

opportunities, and provide the Debtors with a competitive edge. The Customer Programs include the following programs and practices.

- *Subscription Programs.* The Debtors maintain subscription programs, whereby subscribers pay a fee in advance to subscribe to a publication published by the Debtors, and the Debtors are required to deliver the publication or to provide online access to the subscriber. As of the Petition Date, I believe that the Debtors have obligations approximately 50,000 subscribers to deliver print publications or to provide online access to publications, representing approximately $8.0 million in unearned revenue.

- *Reserved Advertising Programs.* The Debtors also offer advertisers the option to reserve advertising space in the Business Information Division's print publications and on its websites. Under such programs, rather than soliciting advertising on an ad hoc basis for each issue of the Debtors' publications, the Debtors contract with advertisers to guarantee advertising space in future issues. As of the Petition Date, I believe that the Debtors have obligations under the Reserved Advertising Programs to approximately 2,500 advertising customers, representing approximately $6 million in unearned and future revenue.

- *Public Notice Programs.* Many of the Business Information Division's publications derive a significant portion of their revenue through public notice programs, which customers generally use to publish legally required announcements regarding government or government-related activities. In order to add value and convenience for customers, certain of the Public Notice Programs permit customers to place public notices in publications of both the Debtors and third parties. Under such arrangements, the Debtors engage and pay the third-party publication directly to publish the customer's public notice. As of the Petition Date, I believe that the Debtors owe third party publications approximately $62,000 on account of the Public Notice Programs.

- *Prepayment Programs.* In certain segments of the Debtors' business, the Debtors offer customers the option to prepay for services that will be delivered in the future. For example, customers of the Professional Services Division may pay the Debtors a deposit or fixed fee prior to the Debtors' providing litigation support services to such customers. Similarly, certain of the Debtors provide print production services—such as printing and binding services for brochures, annual reports, and similar publications—to customers, some of whom prepay the Debtors. As of the Petition Date, I believe that the Debtors have incurred approximately $765,000 in obligations to customers under the Prepayment Programs.

KE 29888458

- **Credits.** In the ordinary course of business, the Debtors offer credits for, among other things, refunds and billing adjustments. Credits are determined on a case-by-case basis when, for example, a subscriber cancels its subscription to one of the Debtors' publications prior to the end of the subscription's term. Credits are also sometimes owed to customers due to billing errors or duplicate payments, among other billing issues. As of the Petition Date, I estimate that the Debtors owe customers approximately $258,000 in Credits.

- **Publishing and Reselling Services.** The Debtors offer customers complete publishing and reselling services, pursuant to which the Debtors may, among other things, edit, lay out, typeset, print, bind, and distribute publications containing content created by their customers. Under the Debtors' typical arrangements with their customers, the Debtors directly sell the publications to third parties, retaining a portion of the proceeds for themselves and remitting the remainder to the customer. As of the Petition Date, I believe that the Debtors owe approximately $7,000 to customers on account of the Publishing and Reselling Services Programs.

- **Barter Arrangements.** Prior to the Petition Date, the Debtors entered into certain barter arrangements with various third-party businesses pursuant to which the Debtors typically provide advertising space in their publications or websites in exchange for valuable goods or services. As of the Petition Date, I believe that the Debtors have obligations under the Barter Arrangements to approximately 44 third parties, representing approximately $400,000 in terms of the value of services owed.

- **Data Hosting Program.** Debtor assure360 provides a broad array of electronic data management services, including case management services and electronic data storage. In connection with such services, assure360 offers clients the option to store electronic data with assure360 itself. As of the Petition Date, I believe that assure360 has such data-storage obligations to approximately 12 clients.

72.    I believe that the Debtors' ability to continue the Customer Programs and to honor their obligations thereunder in the ordinary course of business is necessary to retain their reputation for reliability, to generate goodwill, to meet competitive market pressures, and to ensure customer satisfaction, thereby retaining current customers, attracting new ones, and, ultimately, enhancing revenue and profitability, all for the benefit of the Debtors' creditors and stakeholders. I also believe that the relief requested in the Customer Programs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will

enable the Debtors to continue to operate their businesses in chapter 11 without disruption. Accordingly, on behalf of the Debtors, I respectfully submit that the Customer Programs Motion should be approved.

> **E.    Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, the Payment of Certain Prepetition Taxes, Governmental Assessments, and Fees and (B) Granting Related Relief ("Taxes Motion").**

73.     Pursuant to the Taxes Motion, the Debtors seek entry of an order, (a) authorizing, but not directing, the Debtors to pay taxes, governmental assessments, and fees accrued prior to the Petition Date and that will become payable during the pendency of these chapter 11 cases, and (b) granting related relief.

74.     In the ordinary course of their business, the Debtors collect, withhold, and incur sales taxes, use taxes, franchise taxes and fees, and property taxes, as well as other taxes, fees, assessments, and charges described in the Taxes Motion.  The Debtors remit the Taxes and Fees to various federal, state, and local governments, including taxing and licensing authorities.

75.     The Debtors believe that many of the Taxes and Fees collected prepetition are not property of the Debtors' estates, but are rather held in trust and must, for that reason, be turned over to the applicable Governmental Authorities.  To the extent that such funds are not actually property held in trust for the Governmental Authorities, they may well give rise to priority claims that must be paid in full eventually.  Moreover, the Debtors also seek to pay certain prepetition Taxes and Fees in order to forestall Governmental Authorities from taking actions that might interfere with the Debtors' successful reorganization, which may include bringing personal liability actions against directors, officers and other key employees, whose full-time attention to the Debtors' reorganization efforts is required to avoid business disruptions.  Any business disruptions resulting from such lawsuits could negatively impact the Debtors' restructuring

prospects.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Taxes Motion should be granted.

      **F.**    **Debtors' Motion for Entry of Interim and Final Orders (A) Determining Adequate Assurance of Payment for Future Utility Services, (B) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (C) Establishing Procedures for Determining Adequate Assurance of Payment, and (D) Granting Related Relief ("Utilities Motion").**

      76.    Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders, (a) determining adequate assurance of payment for future utility services, (b) prohibiting Utility Companies from altering, refusing, or discontinuing services, (c) establishing procedures for determining adequate assurance of payment, and (d) granting related relief.

      77.    In the ordinary course of their businesses, the Debtors incur utility expenses for electricity, natural gas, telephone, water, waste disposal, and other similar services from a number of utility companies or their brokers.  On average, the Debtors pay approximately $122,000 each month for third party Utility Services, calculated as a historical average over a twelve-month period.

      78.    Preserving Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations and, therefore, to the success of their reorganization.  Indeed, any interruption in utility services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their customers.  I believe this disruption would adversely impact customer relationships resulting in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' reorganization efforts and, ultimately, value and creditor recoveries.  It is critical, therefore, that utility services continue uninterrupted during these chapter 11 cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Utilities Motion should be granted.

KE 29888458

G.    **Debtors' Motion for Entry of an Order (A) Authorizing, But Not Directing, the Debtors to Continue Existing Insurance Policies Entered into Prepetition and to Satisfy Prepetition Obligations Related Thereto and (B) Granting Related Relief ("Insurance Motion").**

79.    Pursuant to the Insurance Motion, the Debtors seek entry of an order, (a) authorizing, but not directing, the Debtors to (i) continue prepetition practices regarding their Insurance Policies, (ii) satisfy payment of prepetition obligations related thereto in the ordinary course of business, and (iii) renew, supplement, or purchase Insurance Policies and related coverage in the ordinary course of business, and (b) granting related relief.

80.    In the ordinary court of business, the Debtors maintain insurance policies that are administered by multiple third-party insurance carriers.  These policies provide coverage for, among other things, the Debtors' property, general liability, automobile liability, marine liability, terrorism, umbrella coverage, and excess liability.

81.    I believe that continuation of the Insurance Policies, and having the ability to renew or enter into new Insurance Policies, is essential to the preservation of the value of the Debtors' businesses, properties, and assets.  Moreover, in many cases, coverage provided by the Insurance Policies is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the requirements of the Office of the United States Trustee.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion should be granted.

H.    **Debtors' Motion for Entry of Interim and Final Orders (A) Approving Notification and Hearing Procedures for Certain Transfers of Common Stock and Preferred Stock and (B) Granting Related Relief (the "NOL Motion").**

82.    Pursuant to the NOL Motion, the Debtors seek entry of interim and final orders (a) approving certain notification and hearing procedures (the "Procedures") related to certain transfers of Dolan's common stock and 8.5% series B cumulative preferred stock or any

beneficial ownership  therein (any such record or beneficial ownership of common stock and 8.5% series B cumulative preferred stock, respectively, the "Common Stock" and the "Preferred Stock"), (b) directing that any purchase, sale, or other transfer of Common Stock or Preferred Stock in violation of the Procedures shall be null and void *ab initio*, and (c) granting related relief.

83.     I understand that a company generally generates net operating losses ("NOLs") if it has incurred more expenses than it has earned revenues in a tax year.  Additionally, I understand that subject to certain conditions, as discussed below, a company may apply, or "carry forward," NOLs to reduce future tax payments in a tax year or years up to 20 years after the year in which the NOLs were generated.  As of December 31, 2013, I estimate that the Debtors have NOLs in the amount of approximately $150 million.  I believe that the NOLs are of significant value to the Debtors and their estates because the Debtors can carry forward their NOLs to offset their future taxable income for up to 20 years, thereby reducing their future aggregate tax obligations, and may utilize the NOLs to offset any taxable income generated by transactions consummated during these chapter 11 cases.  I understand, however, that section 382 of the Internal Revenue Code, 26 U.S.C. §§ 1–9834, limits the amount of taxable income that can be offset by a corporation's NOLs in taxable years (or a portion thereof) following an ownership change, which generally occurs if the percentage (by value) of the stock of a corporation owned by one or more 5% shareholders has increased by more than 50 percentage points over the lowest percentage of stock owned by such shareholders at any time during the three-year testing period ending on the date of the ownership change.

KE 29888458

84.     The Procedures are the mechanism by which the Debtors will monitor, and object to, certain transfers of the Equity Securities to ensure preservation of the NOLs.  The key terms of the Procedures are as follows:

- The Debtors will serve or cause to be served notice of the interim order or the final order, as applicable, and the Procedures upon all parties in interest, no later than two business days after entry of the interim order or the final order, as applicable.

- Any person or entity that has direct or indirect beneficial ownership of 4.5% or more of Common Stock or 4.5% or more of Preferred Stock (each, a "Substantial Shareholder") must file with the Court, and serve upon the notice parties, a declaration of status as a substantial shareholder.

- Prior to effectuating any transfer of beneficial ownership of Common Stock or Preferred Stock that would (a) impact the size of a Substantial Shareholder's beneficial ownership, or (b) would result in another entity becoming or ceasing to be a Substantial Shareholder, the parties to such transaction must file with the Court, and serve upon the notice parties, as applicable, a declaration of intent to accumulate Common Stock or Preferred Stock, or a declaration of intent to transfer Common Stock or Preferred Stock.

- The Debtors shall have 14 calendar days after receipt of a declaration of intent to accumulate Common Stock or Preferred Stock or a declaration of intent to transfer Common Stock or Preferred Stock to object to the proposed transaction.

- If the Debtors timely object, the proposed transaction will remain ineffective pending a final and nonappealable order of the Court unless such objection is withdrawn by the Debtors.

- If the Debtors do not object, the proposed transaction may proceed solely as described in the declaration of intent to accumulate Common Stock or Preferred Stock or the declaration of intent to transfer Common Stock or Preferred Stock.

- Any transfer of Common Stock or Preferred Stock in violation of the Procedures shall be null and void *ab initio*.

85.     For the reasons set forth above, I believe that the NOLs are a valuable asset of the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

III.    **Claims and Schedules Process.**

    A.    **Debtors' Motion for Entry of an Order (A) Providing an Extension of Time to File Schedules and Statements of Financial Affairs, (B) Providing for A Permanent Waiver of the Requirement to File Schedules and Statements of Financial Affairs upon Confirmation of the Plan, (C) Waiving the Requirements to File A List of and Provide Notices Directly to Equity Security Holders, and (D) Granting Related Relief (the "Schedules and SoFAs Motion").**

    86.    Pursuant to the Schedules and SoFAs Motion, the Debtors seek entry of an order (a) extending to the date that is 60 days from the date hereof the date on or before which the Debtors must file their Schedules and Statements, other than each Debtor's Modified Schedule F (i.e., the schedule of creditors holding unsecured nonpriority claims as modified for creditors that hold claims listed on the Debtors' books and records in the amount of $100,000 or more on account of a single act or occurrence), (b) permanently waiving the requirement that the Debtors file the Schedules and Statements upon confirmation of the Plan if confirmation occurs on or before the date that is 60 days from the date hereof, (c) waiving the requirements to file a list of and provide notice directly to Dolan's equity security holders, and (d) granting related relief.

    87.    Due to the large number of creditors present in these chapter 11 cases, the size of the Debtors' businesses, and the substantial volume of information that would be required to complete the Schedules and Statements, as well as the fact that these chapter 11 cases will be set for confirmation of a plan in the very near term, the Debtors do not believe the thirty-day period provided for under Local Rule 1007-1(b) will be sufficient to complete the Schedules and Statements (other than Modified Schedule F).

    88.    The Debtors submit that the large amount of information that must be assembled and compiled, the hundreds of employee and professional hours required for the completion of the Schedules and Statements, and the lack of prejudice to creditors that would result in the requested extension being granted all constitute good and sufficient cause for granting the relief

KE 29888458

sought by the Schedules and SoFAs Motion. Because the Lenders—which make up the only class entitled to vote to accept or reject the Plan—have overwhelmingly accepted the Plan and allowed general unsecured claims are unimpaired under the Plan, the Debtors' resources would be best used to ensure that the Debtors' businesses run smoothly through what the Debtors expect will be a brief prepackaged chapter 11 process.

89.     The Debtors likewise submit that the requirements to file a list of and to provide notice directly to equity holders should be waived as to Dolan in this case. Dolan is a publicly-traded company with over 31 million common and preferred shares outstanding. It does not itself maintain a list of its equity security holders and therefore must obtain the names and addresses of its shareholders from a securities agent. Preparing and submitting such a list with last known addresses for each such equity security holder and sending notices to all such parties will be expensive and time consuming and will serve little or no beneficial purpose— the only class entitled to vote to accept or reject the Plan has already accepted the Plan. Moreover, Dolan filed with its petition a list of holders of five percent or more of its outstanding common stock based on information ascertained from filings with the U.S. Securities and Exchange Commission. Finally, as soon as is practicable following the date hereof, the Debtors intend to cause their proposed notice and claims agent to obtain a list of nominees of Dolan's equity securities and to serve the notices required under Bankruptcy Rule 2002(d) on such nominees.

90.     I believe that the relief requested in the Schedules and SoFAs Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will preserve the assets of the Debtors' estates during the chapter 11 process without prejudice to any party in interest. Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules and SoFAs Motion should be approved.

B. **Debtors' Motion for Entry of an Order (A) Establishing Limited Bar Dates for Filing Proofs of Claim, (B) Approving the Form and Manner for Filing Proofs of Claim, (C) Approving Notice Thereof, and (D) Granting Related Relief (the "Bar Date Motion").**

91.     Pursuant to the Bar Date Motion, the Debtors seek entry of an order establishing 5:00 p.m., prevailing Eastern Time, on the first business day that is 35 days after the Petition Date, as the last date and time to file proofs of claim based on the Applicable Claims (i.e., unsecured non-priority claims in an amount equal to or greater than $100,000 on account of a single act or occurrence).  In addition, the Bar Date Motion also seeks approval of the form and manner of filing Applicable Claims, approval of the form and manner of notice of the Bar Dates, authorization to establish Supplemental Bar Dates, and authorization to extend a Bar Date if doing so is in the best interests of the Debtors' estates.

92.     I understand the purpose of providing a Bar Date for claims valued at $100,000 or greater is to allow the Debtors and the Prepetition Credit Agreement Claim Holders, who pursuant to the Plan will receive 100 percent of the Reorganized Equity in the Reorganized Debtors, the ability monitor the amount of general unsecured claims.  Allowed general unsecured claims will receive a full recovery under the Plan and, as the expected future owners of the Reorganized Debtors, the Prepetition Credit Agreement Claim Holders need to be apprised of any large unsecured claims that could significantly reduce the value of the Reorganized Debtors.

93.     The Debtors do not anticipate that there will be many holders of Applicable Claims in these chapter 11 cases.  Moreover, an expedited bar date process is an important part of the restructuring transactions agreed to with the Lenders.  In short, to implement a streamlined restructuring pursuant to the Plan and exit chapter 11 as soon as possible, the Bar Date for the Applicable Claims is necessary.

KE 29888458

94.    I believe that clearly established procedures for the filing of claims against the Debtors will limit confusion on the part of holders of claims and result in an efficient claims reconciliation and resolution process.  More specifically, if the Debtors identify any Applicable Claims, the relevant claimholder will be sent a personalized proof of claim form that provides information about how the Applicable Claim is listed in the Modified Schedule F.  If a holder of an Applicable Claim agrees with the treatment of its claim as provided for in the Modified Schedule F, such holder will not be required to file a proof of claim.  The Debtors will also provide notice of the Bar Dates to other parties in interest so that such entities may file proofs of claim on account of any Applicable Claims such entities may assert.

95.    I believe that the relief requested in the Bar Date Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to satisfy their obligations under the Plan and Restructuring Support Agreement, thereby providing for a more efficient chapter 11 process.  Accordingly, on behalf of the Debtors, I respectfully submit that the Bar Date Motion should be approved.

KE 29888458

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: March 23, 2014

Kevin Nystrom
Chief Restructuring Officer
The Dolan Company