## IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re:<br><br>THE DOLAN COMPANY, *et al.*,<br><br>Debtors. | Chapter 11<br><br>Case No. 14-10614 (BLS)<br><br>(Jointly Administered)<br><br>**Hearing Date: Commencing on May 27, 2014**<br><br>**Objection Deadline: May 19, 2014**<br><br>**Related to Docket No. 16** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF
## EQUITY SECURITY HOLDERS TO CONFIRMATION OF
## THE DEBTORS' JOINT PREPACKAGED PLAN OF REORGANIZATION
## PURSUANT TO CHAPTER 11 OF THE BANKRUPTCY CODE

May 19, 2014

**BAYARD, P.A.**
Neil B. Glassman
GianClaudio Finizio
Justin R. Alberto
222 Delaware Avenue, Suite 900
Wilmington, Delaware 19899

**BROWN RUDNICK LLP**
Robert J. Stark
Andrew Dash
Seven Times Square
New York, New York 10036

**BROWN RUDNICK LLP**
Steven B. Levine
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8587
Facsimile: (617) 289-0418

*Proposed Co-Counsel for*
*the Official Committee of Equity Security Holders*

Redacted using Redact-It

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT.................................................................................................. 1

FACTS ................................................................................................................................... 9

I.     General Case Background. .......................................................................................... 9

II.    The Debtors' Businesses
And Historical Causes of Financial Trouble. .............................................................. 9

III.   Events Leading To The Chapter 11 Filings. ............................................................. 11

       A.     Spring and Early Summer 2013: .................................................................... 11

       B.     The Blair/VRA M&A Process. ........................................................................ 12

       C.     The Debtors Retain PJSC And Michael Knight
As Chief Restructuring Officer; Bayside Emerges
As Majority Lender; Bayside Announces Its Takeover
Intent; And, The Scope Of PJSC's Retention Expands. .................................. 15

       D.     The January 7th Board Letter And Bayside's Response. .................................. 17

       E.     Kevin Nystrom Succeeds Michael Knight As
Chief Restructuring Officer; The Debtors
Produce New Projections; Plan Votes Are
Solicited; And PJSC Receives The Pre-Petition Bonus. ................................. 20

IV.   Future BAC Work Flow............................................................................................. 21

LEGAL ARGUMENT ........................................................................................................ 23

I.     The Plan Should Not Be Confirmed Because The
Debtors Cannot Carry Their Burdens Of Proof And Persuasion. ................................ 23

       A.     The Plan Should Not Be Confirmed
Because It Does Not Meet The
"Good Faith" Requirement Of Section 1129(a)(3). ......................................... 23

       B.     The Plan Should Not Be Confirmed
Because it Does Not Meet The "Fair And
Equitable" Requirement Of Section 1129(b). ................................................. 25

II.    The Parties Should Be Directed to Judicial Mediation
To Facilitate Prompt Negotiation Of A Fully Consensual Plan. .................................. 29

CONCLUSION .................................................................................................................. 30

Redacted using Redact-It

# TABLE OF AUTHORITIES

**Page(s)**

CASES

Cede & Co. v. Technicolor, Inc.,
No. 7129, 1990 WL 161084 (Del. Ch. Oct. 19, 1990)................................................................3

Chartwell Lit. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.),
346 B.R. 621 (Bankr. E.D.N.Y. 2006) ................................................................4, 27

Consolidated Rock Prods. Co. v. DuBois,
312 U.S. 510 (1941) ................................................................4, 6, 27, 28

Cox Enters., Inc. v. News-Journal Corp.,
510 F.3d 1350 (11th Cir. 2007) ................................................................4, 27

Edgewater Growth Capital Partners LP v. H.I.G. Capital, Inc.,
68 A.3d 197, 229 (Ch. Del. 2013) ................................................................19

Everett v. Perez (In re Perez),
30 F.3d 1209 (9th Cir. 1994) ................................................................24

Gearreald v. Just Care, Inc.,
2012 WL 1569818 (Del Ch. Apr. 30, 2012) ................................................................5, 28

Global FT LP v. Golden Telecom, Inc.,
993 A.2d 497 (Del. Ch. 2010), aff'd, 11 A.3d 214 (Del. 2010) ................................................................5, 28

In re Advance Nanotech, Inc.,
2014 WL 1320145 (Bankr. D. Del. Apr. 2, 2014) ................................................................19

In re Appraisal of the Orchard Enters., Inc.,
C.A. No. 5713-CS 2012 WL 2923305 (Del. Ch. July 18, 2012) ................................................................4, 5, 27, 28

In re Armstrong World Indus.,
348 B.R. 111 (D. Del. 2006) ................................................................23

In re Bush Indus., Inc.,
315 B.R. 292 (Bankr. W.D.N.Y. 2004) ................................................................24, 28

In re Carmania Corp. N.V.,
156 B.R. 119 (Bankr. S.D.N.Y. 1993) ................................................................7, 29

In re Coram Healthcare Corp.,
271 B.R. 228 (Bankr. D. Del. 2001) ................................................................24

In re Exide Techs.,
303 B.R. 48 (Bankr. D. Del. 2003) ................................................................ passim

Redacted using Redact-It

*In re Future Energy Corp.*,
    83 B.R. 470 (Bankr. S.D. Ohio 1988) ...................................................26

*In re Genesis Health Ventures, Inc.*,
    266 B.R. 591 (Bankr. D. Del. 2001) ....................................................26

*In re Granite Broad. Corp.*,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007) ...................................................5

*In re Holly Farms Corp. S'holders Litig.*,
    1988 WL 143010 (Del Ch. Dec. 30, 1988) ...........................................17

*In re MCorp Fin., Inc.*,
    137 B.R. 219 (Bankr. S.D. Tex. 1992) ..................................................26

*In re Mirant Corp.*,
    334 B.R. 800 (Bankr. N.D. Tex. 2005) .................................................27

*In re Nellson Nutraceutical, Inc.*,
    2007 Bankr. LEXIS 99 (Bankr. D. Del. Jan. 18, 2007) ......................4, 27

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) ....................................................5

*In re Penn Cent. Transp. Co.*,
    596 F.2d 1102 (3d Cir. 1979) ........................................................17, 25

*In re Pullman Const. Indus., Inc.*,
    107 B.R. 909 (Bankr. N.D. Ill. 1989) ....................................................3

*In re Quigley Co.*,
    437 B.R. 102 (Bankr. S.D.N.Y. 2010) .................................................24

*In re Teltronics Servs., Inc.*,
    29 B.R. 139 (Bankr. E.D.N.Y. 1983) ..................................................19

*In re Walat Farms, Inc.*,
    70 B.R. 330 (Bankr. E.D. Mich. 1987) ................................................26

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ......................................................24

*Muoio & Co. v. Hallmark Entm't Invs. Co.*,
    2011 WL 863007 (Del. Ch. Mar. 9, 2011) ...........................................28

*New England Coke & Coal Co. v. Rutland R. Co.*,
    143 F.2d 179 (2d Cir. 1944) ...............................................................26

Redacted using Redact-It

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414 (1968) ..............................................................................27

**STATUTES**

11 U.S.C. § 1107(a) and 1108..............................................................................9

11 U.S.C. § 1108 ..............................................................................9

11 U.S.C. § 1129(a)(3) ..............................................................................24, 25

11 U.S.C. § 1129 ..............................................................................23

11 U.S.C. § 1129(a) ..............................................................................8, 23

11 U.S.C. § 1129(b) ..............................................................................8, 23, 25, 29

11 U.S.C. § 363 ..............................................................................7

**OTHER AUTHORITIES**

7 Collier on Bankruptcy ¶ 1129.02[4] (16th ed. rev. 2014) ............................................23

7 Collier on Bankruptcy ¶ 1129.04[4][a][i] ..............................................................26

Hon. Christopher S. Sontchi, Valuation Methodologies: A Judge's View, 20 Am. Bankr. Inst. L. Rev. 1, 9 n.13 (2012) ..............................................................5, 27

Ibbotson SBBI 2010 Valuation Yearbook, Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009 at 64..............................................................5, 28

Peter V. Pantaleo & Barry W. Ridings, Reorganization Value, 51 Bus. Law. 419, 431 (1996) ..............................................................3

Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples at 268 (4th ed. 2010) ..............................................................6, 28

Stuart C. Gilson, Edith S. Hotchkiss & Richard S. Ruback, Valuation of Bankruptcy Firms 13-1 Rev. Fin. Stud. 43 (2000) ..............................................................5, 27

Redacted using Redact-It

The Official Committee of Equity Security Holders (the "Equity Committee") of The Dolan Company and its affiliated debtors (collectively, the "Debtors"),[1] by and through its proposed undersigned counsel, hereby submits this objection (the "Objection") to confirmation of the *Debtors' Joint Prepackaged Plan of Reorganization Pursuant to Chapter 11 of the Bankruptcy Code* [Docket No. 16] (the "Plan").   In support of the Objection the Equity Committee respectfully represents as follows:

## PRELIMINARY STATEMENT

1.       The Debtors' pleadings to date reflect a certain case narrative.  According to the Debtors, the enterprise is composed of moribund businesses, tied to and brought down by the nation's "robo-signing" foreclosure fiasco, and lacking meaningful growth prospects.   They project their primary secured lender, Bayside Capital, Inc. ("Bayside"), as the case "white-knight," charitably accepting reorganized Debtor stock to facilitate full payment to unsecured creditors, even though the value of the anticipated stock distribution is well below the amount of secured debt.  Indeed, the value of such stock is, according to the Debtors, so low that present stockholders are "hopelessly" out-of-the-money.

2.       The evidence so far delivered to the Equity Committee tells quite a different story.

---

[1]       The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number include: The Dolan Company (4527); American Processing Company, LLC (3395); Arizona News Service, LLC (0969); assure360, LLC (8926); Counsel Press, LLC (0509); Daily Journal of Commerce, Inc. (1624); Daily Reporter Publishing Company (9860); DataStream Content Solutions, LLC (6276); Dolan APC LLC (3828); Dolan Media Holding Company (0186); Dolan Publishing Company (3784); Dolan Publishing Finance Company (5133); Federal News Service LLC (5309); Finance and Commerce, Inc. (2942); Idaho Business Review, LLC (6843); Lawyer's Weekly, LLC (6760); Legislative Information Services of America, LLC (4027); Long Island Business News, LLC (4338); Missouri Lawyers Media, LLC (8890); National Default Exchange Holdings, LLC (1918); New Orleans Publishing Group, L.L.C. (2405); NOPG, L.L.C. (9511); The Daily Record Company LLC (7310); and The Journal Record Publishing Co., LLC  (5769).  The location of the Debtors' service address is: 222 South Ninth Street, Suite 2300, Minneapolis, Minnesota 55402.

Redacted using Redact-It

3.      The Debtors' businesses are, in actuality, quite viable and valuable.  Their "crown jewel" e-discovery business, discoverReady LLC ("<u>DiscoverReady</u>"), has extraordinary growth potential.  All material vestiges of the troubled foreclosure unit were removed from the conglomerate months ago.  Moreover, Bayside is not the case "white-knight," as presented.  Its actions reflect a far more Machiavellian nature: (a) Bayside began acquiring the Debtors' secured indebtedness (the "<u>Bank Debt</u>") late in the restructuring process, and materially increased its holdings in late January and early February 2014 (less than two months before the bankruptcy filing); (b) from inception, Bayside made clear that it would oppose any restructuring that did not deliver the reorganized businesses to Bayside; and (c) Bayside appointed itself Administrative Agent for secured lenders, imposed on the Debtors massive "pay-in-kind" fees and interests (eventually totaling 9% of the underlying debt) and near-term covenant "trip-wires," to further control the process to Bayside's intended outcome.

4.      The evidence further shows that this is a "hostile" takeover.  In early December 2013, Bayside emerged as the majority holder of Bank Debt, advocating for Chapter 11 and lender (primarily, Bayside) takeover of the businesses.  On January 7, 2014, all members of the Debtors' Board of Directors signed a letter addressed "To Parties Interested in Maximizing the Value of The Dolan Company" (the "<u>January 7th Board Letter</u>").  The January 7th Board Letter pleaded for an alternative path, noting the "strong case to be made" that stockholders are entitled to value, and laying out non-bankruptcy strategies leading to 100% lender repayment.

5.      That same day, Bayside executed a Credit Agreement Amendment that, among other things: (a) imposed a heavy economic penalty on the Debtors; (b) compelled the appointment of a Chief Restructuring Officer "satisfactory" to Bayside; and (c) obligated the Debtors to assume all of Bayside's future legal costs.  Days later, Bayside's counsel sent a

Redacted using Redact-It

strongly-worded letter to the Board threatening legal action (paid for by the Debtors) against each Director.  That letter also "demanded," among other things, that the newly-appointed, Bayside-approved CRO be vested with "sole authority over the overall [r]estructuring of the Company" and that the Debtors execute a restructuring term sheet within two weeks of receipt from Bayside.  Two weeks later, Bayside executed another Credit Agreement Amendment that, among other things, conditioned the waiver on the Debtors' prompt acceptance of the Bayside takeover.  By the end of February, Bayside had also secured the termination of James Dolan as Chief Executive Officer and Scott Pollei as Chief Operating Officer, and both gentlemen were effectively "gagged" by market atypical non-disparagement provisions in their separation agreements.

6.     Cleared of all corporate governance hurdles, the job then became "papering over" the Debtors' valuation.  This became the responsibility of the new CRO Kevin Nystrom (of Zolfo Cooper LLP) and investment banker Durc Savini (of Peter J. Solomon Company).  The evidence shows that, in performing this function, Mr. Nystrom was something of a transaction confidant of Bayside-executive Sean Britain, expressing in one email his "worry" that "the Board and [Mr. Dolan would] do something stupid."  Business projections created under his control were only two and a half years post-bankruptcy – a remarkably short projection period,[2] especially considering that at least one major business unit had recently prepared five year

---

[2]     See, e.g., Peter V. Pantaleo & Barry W. Ridings, Reorganization Value, 51 Bus. Law. 419, 431 (1996) ("Many appraisers, as a general rule, suggest that forecasts cover at least five years."); see also In re Pullman Const. Indus., Inc., 107 B.R. 909, 920 (Bankr. N.D. Ill. 1989) (five year forecasts appropriate because, by then, "Pullman would regain its historical market share and achieve its growth projections."); Cede & Co. v. Technicolor, Inc., No. 7129, 1990 WL 161084, at *26 (Del. Ch. Oct. 19, 1990) (noting that in DCF analyses, the projection period is often five years).

Redacted using Redact-It

projections for other purposes.[3]   The strategic impact of this decision is that the Discounted Cash

Flow ("DCF") "terminal value" – the largest component of a DCF valuation – would not be

normalized (e.g., operating margins returning to pre-restructuring levels), but rather would

assume "in perpetuity" residual negative impacts of financial trouble (e.g., compressed margins),

in contravention of applicable legal principles.[4]   The projections also do not reflect the likely

resumption of work volume historically commissioned by DiscoverReady's largest customer,

Bank of America Corporation ("BAC").    BAC work was temporarily "curtailed," pending

resolution of the Debtors' restructuring initiatives, but surrounding evidence attests to the

likelihood that BAC work should resume to historical levels.[5]   The projections, in sum, appear

---

[3]      In or around the fall of 2013, management deemed it appropriate to reassess the valuation of
"good will" related to the Debtors' "Business Information" business segment prior to annual
impairment testing.   Projections were prepared into 2018, including adjusted EBITDA and
margins (the "September 2013 Business Information Projections").   Projections produced under
Mr. Nystrom's control not only involved a far shorter time frame, they also anticipated
dramatically reduced annual cash flows and margins.   This raises serious credibility issues for the
Debtors. See, e.g., In re Nellson Nutraceutical, Inc., Case No. 06-10072, 2007 Bankr. LEXIS 99,
at *4 (Bankr. D. Del. Jan. 18, 2007) (Sontchi, Bankr. J.).

[4]      See, e.g., Consolidated Rock Prods. Co. v. DuBois, 312 U.S. 510, 526 (1941) (finding that
valuation must be based on cash flows "freed from the heavy hand of past errors, miscalculations
or disaster"); Cox Enters., Inc. v. News-Journal Corp., 510 F.3d 1350, 1358-59 (11th Cir. 2007)
(appropriate to "normalize" future earnings and operating margins to reflect the changing nature
of the business); Chartwell Lit. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 346
B.R. 621, 641 (Bankr. E.D.N.Y. 2006) (disqualifying an expert for, among other things, failing to
normalize cash flows); In re Appraisal of the Orchard Enters., Inc., C.A. No. 5713-CS 2012 WL
2923305, at *15 (Del. Ch. July 18, 2012) (Strine, Ch.) ("The petitioners' challenge is grounded in
the sound valuation principle that because the terminal value is meant to capture the present value
of all future cash flows of the company, typically the net cash flow figure used to generate the
terminal value should be normalized, rather than unrealistically extrapolate a company's short run
circumstances into perpetuity." (citation omitted)).

[5]      See May 16, 2014 Dep. J. Ritter at 43-44 ("There was definitely a decline in technology services
work between – in origination and then ultimately actual work between July and, frankly, it kind
of persisted with – you know, you take on a little bit of work here and there, but for the most part
it persisted through until about April, we started to take on more work."); Id. at 45 ("And then in
April we went back to levels that we had seen at the beginning of last year, which were 6 to 8
terabytes of work a month."); March 14, 2014 "Flash Report" (the "opportunity" for new BAC
work "remains alive pending a public announcement that [DiscoverReady] is financially
sound.").

Redacted using Redact-It

influenced by strategic design.[6]

      7.     Mr. Savini's work (valuation mid-point, $118.4 million) likewise appears results driven.[7] He fully accepted, without adjustment, the Debtors' two and a half year projections; he did not normalize margins or cash flows; he did not add anticipated BAC work accretion; he continued the "restructuring overhang" going forward and, for DCF purposes, "into perpetuity." Mr. Savini did not employ the "Comparable Transactions" valuation method, even though there have been more than 30 e-discovery M&A transactions since 2012.  In his DCF analysis (adjusted CAPM calculation), Mr. Savini made controversial determinations: (a) he calculated the "equity risk premium" based on Ibbotson's "historical" rate (6.70%) instead of Ibbotson's "supply-side" rate (6.18%);[8] and (b) he calculated the "firm size premium" based on the very

---

[6]      See Hon. Christopher S. Sontchi, Valuation Methodologies: A Judge's View, 20 Am. Bankr. Inst. L. Rev. 1, 9 n.13 (2012) (care must be given because "projections may be manipulated by management to favor its interests or those of others 'friendly' to management."); Stuart C. Gilson, Edith S. Hotchkiss & Richard S. Ruback, Valuation of Bankruptcy Firms, 13-1 Rev. Fin. Stud. 43 (2000) (showing management propensity to undervalue businesses when restructuring arranged with secured lenders) (cited in In re Exide Techs., 303 B.R. 48, 60 & n.25 (Bankr. D. Del. 2003)).

[7]      The terms of Peter J. Solomon's engagement include a remarkable and market atypical provision: The $1.5 million "success" fee was due and payable before the bankruptcy, upon receipt of sufficient votes in favor of the Plan (within Bayside's control).  In other words, Mr. Savini would receive a $750,000 bonus if the Debtors adopted (i.e., he supplied the evidence, akin to a "fairness" opinion, supporting) the Bayside plan, regardless of whether that plan was the objectively correct one for the Debtors' constituents and regardless of whether the Court ultimately accepted his valuation conclusion. See In re Granite Broad. Corp., 369 B.R. 120, 142-43 (Bankr. S.D.N.Y. 2007) (valuation expert's credibility called into question by results-oriented compensation structure); In re Oneida Ltd., 351 B.R. 79, 92 (Bankr. S.D.N.Y. 2006) (same).

[8]      This is unsustainable. See, e.g., Orchard Enters., Inc., 2012 WL 2923305, at *18-19 ("supply-side" as opposed to "historical" is the proper rate); Global GT LP v. Golden Telecom, Inc., 993 A.2d 497, 514-16 (Del. Ch. 2010) (Strine, Ch.), aff'd sub nom, Golden Telecom, Inc. v. Global GT LP, 11 A.3d 214 (Del. 2010)(reviewing literature considering the choice between the two rates, concluding that the academic community has shifted toward greater support for the "supply-side" rate, and ultimately accepting same); Gearreald v. Just Care, Inc., 2012 WL 1569818, at *10 (Del Ch. Apr. 30, 2012)(finding that expert had provided "no persuasive substantive financial reason as to why the application of a supply side equity risk premium would be inappropriate"); see also Ibbotson SBBI 2010 Valuation Yearbook, Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009 at 64 ("over the long run, equity returns should be close to the long-run supply estimate.").

Redacted using Redact-It

highest number found in Ibbotson's 10th decile range (11.65%) instead of the company average within the range (5.99%).[9] Mr. Savini also dramatically lowered the trading multiple derived from the list of comparable companies.    Mr. Savini's reliance on dour projections "into perpetuity" and unfavorable input determinations and assumptions collectively reflect the view that these are terrible businesses, in which no reasonable investor would dare invest, soon to go the way of the "horse and buggy."  The surrounding case data – including Bayside's aggressive pursuit of these businesses – reflects a far different reality.

8.      Additional evidence further establishes that the Debtors' valuation was "made-to-order."   First, about one year ago, before the Debtors severed their devastating foreclosure business, the Administrative Agent for the Bank Debt (then, U.S. Bank National Association) tasked its financial advisor (Mesirow Financial, Inc.) to prepare an enterprise valuation. Mesirow valued the Debtors' businesses at $248.1 million.  Second, in the summer and fall of 2013, the Debtors ran an M&A process for the Debtors' businesses, with initial indications of interest between $205 and $235.6 million.    Third, second round M&A bidding included a

---

[9]      This is unprincipled, ignoring the "fresh start" valuation standard articulated in <u>Consolidated Rock</u> and its progeny. <u>See</u> n.4. The highest discount in the Ibbotson 10th decile range pertains to "highly leveraged companies with small-market capitalizations that probably do not match the characteristics of financially healthy but small companies," "companies with no sales . . . (e.g., speculative start-ups)," or "stocks of troubled companies . . . trading like call options." Shannon P. PRATT & ROGER J. GRABOWSKI, COST OF CAPITAL: APPLICATIONS AND EXAMPLES 268 (4th ed. 2010).  The Debtors will, however, emerge from bankruptcy with a substantially deleveraged balance sheet and, thus, with a far stronger business profile than that described by Messers. Pratt and Grabowski.  Here too, Mr. Savini assumed the Debtors' pre-bankruptcy financial troubles persist "in perpetuity," in contravention of <u>Consolidated Rock</u> and its progeny.

Redacted using Redact-It

DiscoverReady bid of $103 million, which is nearly double Mr. Savini's appraisal.[10]  Although it was a "troubled" M&A process that did not fully mature or conclude with an actual auction, one party submitted a "firm" bid for DiscoverReady (on December 16, 2013, around the time of Bayside emergence) that was approximately $25 million more than Mr. Savini's DiscoverReady valuation.    Fourth, the Debtors' Plan contemplates that the business units to comprise "Reorganized Dolan" (Counsel Press and Business Information) will emerge from bankruptcy with $50 million in exit debt; and, yet, according to Mr. Savini, those businesses are worth only about $47.3 million.  Fifth, ███████████████████████████████████████████████

███████████████████████████████████████████████████.[11]  Mr. Savini ignores all of this data.[12]

---

[10]    The evidence establishes that the Debtors' pre-petition M&A process was beset with problems, including: (a) it dragged on for an extended period of time; (b) throughout the process, it was well-understood that the Debtors were in financial trouble, naturally provoking "bottom fisher" attitudes among bidding parties; (c) was disastrously influenced by the abrupt cancellation by BAC of meetings arranged by the Debtors for the benefit of bidding parties; and (d) was terminated before any negotiations toward price-accretion were undertaken with qualified bidders and before any sort of auction (following the Section 363 model) could be held.    The circumstances thus give little confidence that the pre-petition M&A process ferreted out true inherent business value.  Rather, the circumstances suggest that the bids were wholly insufficient, as attested by the Board of Directors in the January 7th Board Letter ("a distressed sale due to temporary impairment is not conclusive evidence of value") and by Bayside's direction (acceded to by the Debtors) to terminate the M&A process.

[11]    "Smart" money (like Bayside) does not invest with the intention of maintaining or losing value; "smart" money chases arbitrage profit, and that is useful case context. See In re School Specialty, Inc., Case No. 13-10125 (Bankr. D. Del.) (KJC), April 5, 2013 Hear'g Trans. at 82-83 (Testimony of Sean Britain of Bayside: "So to take a loan into that credit committee where there was a possibility that we would not get our – or something approximating our contractual cash-on-cash return, is not something I would do, because the resources that would have been consumed and the capital would not be able to be reinvested, if we couldn't get an appropriate – which in this case was 1.4 to 1.5 times – cash-on-cash return.  In almost all cases, I wouldn't take that loan to my committee.").

[12]    See In re Carmania Corp. N.V., 156 B.R. 119, 125 (Bankr. S.D.N.Y. 1993) (rejecting valuation expert's "skewed, unrealistic assumptions" that were inconsistent with other "objective" case evidence).

Redacted using Redact-It

9.      In support of this Objection, the Equity Committee respectfully submits the valuation report prepared by Goldin Associates LLC (the "Goldin Valuation Report"), attached hereto as Exhibit A.  The Goldin Valuation Report: (a) extends the Debtors' projections to December 2019, incorporating relevant business data (from the September 2013 Business Information Projections) not created for litigation purposes, and also contemplates eventual return to pre-restructuring margins; (b) uses the "supply-side" equity risk premium in accordance with relevant case law and academic literature; (c) calculates the firm size premium by averaging the companies in Ibbotson's 10th decile, thus giving due acknowledgment of the deleveraging impact of bankruptcy; (d) includes a "Comparable Transactions" analysis, given the volume of M&A activity in the e-discovery space since 2012; and (e) considers surrounding case circumstance and other indicia of value, including (i) the $80 million "firm" bid received for DiscoverReady and (ii) the $50 million emergence debt-load proposed for the non-DiscoverReady businesses.  The Goldin Valuation Report concludes that the Debtors' businesses are worth between $191.9 million and $236.1 million, with a $211.8 million mid-point.  The Goldin Valuation Report is corroborated by Mesirow's valuation work.  It is also corroborated by the Board of Directors, who presciently noted in the January 7th Board Letter that equity has a "strong case" for value.

10.     The evidence to be presented at the confirmation hearing will establish that: (a) the Plan was imposed by threat and over-reaching, not by "good faith" negotiation; (b) the Debtors' proposed valuation is results-driven and the product of influence; and (c) the true inherent value of the Debtors' businesses substantially exceeds the allowable amount of debt and, therefore, that the Plan overcompensates Bayside and similarly situated creditors.  The Plan violates Bankruptcy Code Sections 1129(a) and 1129(b) and should not be confirmed.  Rather,

Redacted using Redact-It

the Court should direct all parties to engage in immediate good faith negotiations, under the auspices of a judicial mediator, toward the prompt development of a fully consensual plan of reorganization.

## FACTS

### I.      General Case Background.

11.      On March 23, 2014 (the "Petition Date"), each of the Debtors filed a voluntary Chapter 11 petition with this Court.  The Debtors remain in possession of their assets and manage their businesses as debtors-in-possession, pursuant to Bankruptcy Code Sections 1107(a) and 1108.

12.      With their bankruptcy petitions, the Debtors filed the Plan and the attendant disclosure statement [Docket No. 18] (the "Disclosure Statement"), seeking quick "pre-packaged" confirmation.

13.      On April 23, 2014, the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed the Equity Committee.

### II.      The Debtors' Businesses And Historical Causes of Financial Trouble.

14.      Historically, the Debtors operated four business units:[13]

- DiscoverReady:  DiscoverReady is a leading provider of enterprise e-discovery solutions, including discovery management and document review services.[14] DiscoverReady provides technology services, managed review, analytics and automation, as well as consulting and managed services.[15]    This makes DiscoverReady a comprehensive and integrated enterprise discovery management solution in the e-discovery marketplace.

- Business Information:  Business Information includes print periodicals, specialty titles, and websites, which provide information to legal, financial, government, and real estate sectors in various domestic markets.  Business Information further

---

[13]      See Disclosure Statement § II.A.

[14]      See Exhibit B (DOLAN00003239).

[15]      See Exhibit B (DOLAN00003251).

Redacted using Redact-It

provides specialized information services, which cover legislative and regulatory activities, transcription, media monitoring, and translation services.  Business Information focuses on industry dynamics, recent transactions, and potential opportunities within relevant markets, and provides targeted news and insights.[16]

- Counsel Press:  Counsel Press assists law firms across the country in organizing, preparing, and filing appellate briefs, records, and appendices in state and federal appellate courts nationwide, and several international tribunals.[17]  Counsel Press staffs a team of attorneys and appellate professionals in order to provide everything from drafting to electronic document preparation throughout the appellate process.

- Mortgage Default Processing Services:  This business unit provided mortgage default processing and related services to law firms, mortgage lenders, and loan servicers.[18]  In July 2013, the Debtors sold most of this business unit for $21.3 million.[19]

15.    For many years, each of the business units historically generated reliable and sustainable cash flows.[20]  DiscoverReady is the particularly valuable unit in the conglomerate, with strong growth and momentum.[21]

16.    The Debtors' financial troubles emanate from Mortgage Default Processing Services, which first  encountered financial difficulties in the fall of 2010 following national attention to foreclosure "robo-signing."  As a result, the Debtors violated a Credit Agreement covenant in June 2012.[22]  By March 2013 it was clear that the unit would not rebound, prompting divestiture of the business in July 2013, at a substantial loss (creating the Debtors present over-leverage situation).

---

[16]    See Disclosure Statement § II.B.2.

[17]    See http://www.counselpress.com/.

[18]    See Disclosure Statement § III.B.3.

[19]    See id.

[20]    See Disclosure Statement § III.A.

[21]    See Exhibit B (DOLAN00003290).

[22]    See Disclosure Statement § III.B.

Redacted using Redact-It

**III.**　　　**Events Leading To The Chapter 11 Filings**.

　　**A.**　　**Spring and Early Summer 2013**:
　　　　**The Debtors Continue Workout Negotiations**
　　　　**With U.S. Bank; BAC Curtails New Work Assignments**.

17.　　Through the spring and early summer 2013, the Debtors continued speaking with U.S. Bank and the lenders about Credit Agreement issues, as well as the Debtors' strategy respecting Mortgage Default Processing Services.　The parties entered into a series of Amendments affording interim covenant relief and permitting divestiture of the underperforming business unit.　Lender discussions continued to be conciliatory; in fact, though six Amendments were signed through October 2013, the lenders charged relatively modest fees and increased interest.[23]

18.　　On June 3, 2013, Mr. Dolan reported to the Board's Strategy Committee that the lenders requested an independent valuation of the Debtors' businesses.[24]　U.S. Bank engaged Mesirow to complete this task.　On July 22, 2013, Mesirow produced its valuation report, concluding that the Debtors' businesses collectively had a going concern value of approximately $248 million.[25]　The valuation was undertaken before the Debtors had separated from, and thereby obviated their exposure to, Mortgage Default Processing Services.

19.　　That same month, BAC (DiscoverReady's largest customer) began expressing concerns about the Debtors' financial health.[26]　Though BAC remained "very pleased" with DiscoverReady's services, an internal risk review triggered concerns.[27]　At a June 28, 2013

---

[23]　　See Exhibit C (DOLAN00003788).

[24]　　See id. (DOLAN00003789).

[25]　　See Exhibit D (MFC0000067).

[26]　　See Exhibit C (DOLAN00003734).

[27]　　See id. (DOLAN00003790).

Redacted using Redact-It

Board meeting, Mr. Dolan reported that BAC had put on temporary hold a planned data co-location project.[28]   BAC also determined to put new business on hold, pending a deleveraging of the Debtors' balance sheet.[29]   The Board then began discussing a potential sale of DiscoverReady, "to maintain its value, rather than allow its value to erode if Bank of America, and potentially other clients, were to steer business away due to financial concerns."[30]

B.      **The Blair/VRA M&A Process.**

20.     In July, the Debtors engaged William Blair & Company ("William Blair") and VRA Partners LLC ("VRA Partners") to jointly run an M&A sales process concerning DiscoverReady, and William Blair to itself conduct a larger sales effort respecting the Debtors' other viable business units.[31]   The projected sale price for DiscoverReady was $150 million.[32]

---

[28]      See id. (DOLAN00003734; DOLAN00003790).

[29]      See Exhibit E (DOLAN00000133).

[30]      See Exhibit C (DOLAN00003734).

[31]      See id. (DOLAN00003736-3737).

[32]      See Exhibit F (DOLAN00003685); Exhibit G (BYSD00002490-2496).

Redacted using Redact-It

21.    By the fall, William Blair reported receiving the following indications of interest:

| The Dolan Company (including the Debtors and DiscoverReady) | | |
|---|---|---|
| Party | Indication of Interest | Date Reported to Board |
| Vector | $235.6 million | September 25, 2013[33] |
| Platinum Equity | $235.6 million | October 4, 2014[34] |
| Aurora | $222.5 million | October 4, 2014[35] |
| Clearlake Capital | $205 million | October 4, 2014[36] |
| DiscoverReady[37] | | |
| Party | Indication of Interest | Date Reported to Board |
| Parthenon Capital | $195 million | September 25, 2013 |
| Veritext/Investcorp | $182 million | September 25, 2013 |
| Clearlake Capital | $166 million | September 25, 2013 |
| Xerox | $150 million | September 25, 2013 |
| Debtors (excluding DiscoverReady)[38] | | |
| Party | Indication of Interest | Date Reported to Board |
| The Gores Group | $50.5 million | October 16, 2013 |
| Aurora | $50 million | October 16, 2013 |
| Balmoral Funds | $50 million | October 16, 2013 |
| Highland Capital | $38.2 million | October 16, 2013 |

22.    The Debtors, thereafter, disclosed to bidding parties the following issues concerning the BAC customer relationship: (a) BAC had put DiscoverReady on a temporary new business hold; (b) though BAC had since lifted the hold, work flow did not immediately return to historical levels; (c) BAC would not enter into the co-location agreement absent the Debtors'

---

[33]    See Exhibit H (DOLAN00000087-94).
[34]    See Exhibit E (DOLAN00000122).
[35]    See id.
[36]    See id.
[37]    See Exhibit H (DOLAN00000087-94).
[38]    See Exhibit I (DOLAN00000169-170).

Redacted using Redact-It

announcement of a deleveraging or change of control event by December 12, 2013; and (d) DiscoverReady's financial projections had been revised downward on two occasions.[39]  Bidders also were made aware of continuing workout discussions with U.S. Bank and the lenders.[40]

23.    Naturally, second round bidding deteriorated.

| DiscoverReady (Second Round Bids)[41] | | |
|---|---|---|
| Party | Indication of Interest | Date Reported to Board |
| FTV Capital | $50 million | November 11, 2013 |
| Vector Capital | $70 million | November 11, 2013 |
| Symphony Technology Group (Consilio) | $85 million | November 11, 2013 |
| Clearlake Capital (Inventus) | $103.0 million | November 11, 2013 |

24.    To reverse the negative trend, meetings were scheduled between BAC and remaining bidders for November 13-15, 2013.  On November 12, BAC abruptly cancelled the meetings, without explanation.[42]  Through mid-December 2013, the Debtors continued to interface with Vector and FICO to finalize a DiscoverReady bid.[43]  Vector ultimately submitted a "firm" DiscoverReady bid: $75 million cash, plus a $5 million earnout and 5% warrants.[44]  FICO did not submit a final bid.

25.    The Debtors intended to inform BAC of the Vector bid on December 12, 2013.[45]  Such information might have assuaged BAC's concerns and, in turn, reinvigorated the bidding

---

[39]    See Exhibit J (DOLAN00011838); Exhibit K (DOLAN00003584); Exhibit E (DOLAN00000133).

[40]    See Exhibit E (DOLAN00000133); Exhibit L (DOLAN00013352).

[41]    See Exhibit E (DOLAN00000132).

[42]    See Exhibit M (Email from Brian Oleniczak to team, dated November 19, 2013).

[43]    See Exhibit K (DOLAN00003592-3594; 3598).

[44]    See Exhibit N (DOLAN00009004).

[45]    See Exhibit O (DOLAN00009153).

Redacted using Redact-It

process. The Debtors instead revealed to BAC that the sale would not proceed "because earlier this week, a very large private equity firm stepped in and began buying Dolan's debt."[46]  The sale process was terminated, without any further bidder pursuit or negotiation, and without a formal auction occurring.[47]

**C.    The Debtors Retain PJSC And Michael Knight
As Chief Restructuring Officer; Bayside Emerges
As Majority Lender; Bayside Announces Its
Takeover Intent; And, The Scope Of PJSC's Retention Expands**.

26.    Ten days earlier, on December 2, 2013,[48] the Debtors retained another investment banking firm, Peter J. Solomon Company, L.P. ("PJSC").[49]  PJSC's assignment was unrelated to the M&A process: It was to search the capital markets for new liquidity, ostensibly to refinance Bank Debt.  Though the work scope also included serving as "strategic advisor" to the Debtors, the PJSC engagement letter did not contemplate the provision of any restructuring-related services, such as interfacing with lenders.

27.    A week later, the Debtors appointed Michael Knight (of Alliance Management) Chief Restructuring Officer, subject to lender approval.[50]  Interfacing with lenders was going to be his charge.

28.    The next day, the Board first learned of Bayside.[51]  Mr. Savini attended the Board meeting on behalf of PJSC.  According to meeting minutes, the Board was then told that Bayside had acquired majority participation rights in the Bank Debt, affording it control under the Credit

---

[46]    See id. (DOLAN00009153).

[47]    See *Declaration of Kevin Nystrom, Chief Restructuring Officer of the Dolan Company, In Support of First Day Pleadings* [Docket No. 4] ¶ 37.

[48]    See Exhibit K (DOLAN00003590-3591).

[49]    See Exhibit P (BYSD00002654-2662).

[50]    See Exhibit K (DOLAN00003594).

[51]    See Exhibit K (DOLAN00003595-3596).

15

Redacted using Redact-It

Agreement.  Messrs. Dolan and Savini described Bayside to the Board as a "loan to own fund" and that Bayside "has been interested in the Company for a long time and now has executed on its strategic interest."  Mr. Savini then advised the Board "that he is familiar with Bayside and would like to expand [PJSC's] role to help the Company interact with Bayside and to create restructuring strategies in light of Bayside's presence."

29.   On December 17, senior executives and Mr. Savini attended a "private" meeting with Bayside representatives.[52]  At this meeting, Bayside made clear its opposition to any M&A transaction and its "preference for converting debt to equity … through a prearranged bankruptcy that would result 72 days later with the Company privately held by Bayside."  As explained, stockholders would be "wiped out."  Three days later, Mr. Savini pitched to the Board that his firm's retention should be expanded:

> Savini summarized how [PJSC] would work with attorneys and the future chief restructuring officer and would provide services such as develop restructuring strategies, perform liquidity analyses, assist in achieving milestones, negotiate for the Company, and perform necessary work in connection with a bankruptcy filing.  He said [PJSC] would provide useful backup work and opinions on valuation and would help negotiate with economic stakeholders, defend the Company's positions, and help the Company obtain exit financing.

30.   By January 7, 2014, PJSC had negotiated new terms of engagement.[53]  Under the terms of the restated engagement letter, PJSC's assignment expanded to advisor in connection with either a financing or a restructuring transaction.  The terms of PJSC's compensation included $75,000 monthly fees, "financing" fees predicated on the amount and priority of capital raised, and a "restructuring" fee equal to $1.5 million.

31.   Particularly notable, however, was the timing of the "restructuring" fee: PJSC was enabled to receive 50% of the restructuring fee <u>pre-petition</u>, upon receipt by the Debtors of votes

---

[52]   <u>See</u> Exhibit K (DOLAN00003599-3600).

[53]   <u>See</u> Exhibit Q (BYSD00002452-2462).

Redacted using Redact-It

sufficient for a "pre-packaged" plan of reorganization.  This is a remarkable compensation term, especially given that: (a) Bayside had already made clear how it intended the Debtors to proceed; (b) by then, Bayside presumptively controlled the Bank Debt class; (c) the Debtors did not have meaningful unsecured debt to consider, only stockholder interests, which is a perfect capital structure for "pre-packaged" plan cram-down on stockholders.  All that Mr. Savini needed to do to earn $750,000 (without any litigation risk or Bankruptcy Court scrutiny) was provide the Debtors and Bayside sufficient "backup work and opinions on valuation."  In this way, a powerful economic incentive was put in place.  These terms of engagement bore Bayside's support, as discussed below.

### D.    The January 7th Board Letter And Bayside's Response.

32.    On January 7, 2014, all members of the Board of Directors signed a letter addressed to "Parties Interested in Maximizing the Value of The Dolan Company."[54]  The first sentence of the January 7th Board Letter pointed to Bayside, and Bayside's efforts to push the Debtors into bankruptcy.  The letter implored stakeholders to pursue non-bankruptcy options, enumerating a variety of business and other risks to value.  Respecting equity value in particular, the letter states: "The 2013 sales process may seem to imply there is no equity value, but there is a strong case to be made to the contrary; a distressed sale due to temporary impairment is not conclusive evidence of value."[55]

33.    The letter goes on to lay out two alternative restructuring strategies, both of which were designed for consummation outside of bankruptcy, and would "provide for 100%

---

[54]    See Exhibit G (BYSD00002490-2496).

[55]    The case law supports this viewpoint.  See, e.g., In re Penn Cent. Transp. Co., 596 F.2d 1102, 1115-16 (3d Cir. 1979) (insolvency "distorts" the market perception of value); In re Exide Techs., 303 B.R. 48, 66 (Bankr. D. Del. 2003) (the "taint" of bankruptcy depresses market value); In re Holly Farms Corp. S'holders Litig., 1988 WL 143010, at *1092 (Del. Ch. Dec. 30, 1988) ("flawed" M&A process was "not likely to have maximized the value of the corporation.").

Redacted using Redact-It

repayment of our current senior debt." One option suggested a transfer of DiscoverReady ownership to the lenders "based on a 100% valuation of $100 million." That valuation, according to the January 7th Board Letter: "would be significantly less than the $150 million level estimated by William Blair prior to the business interruption of last summer, but more than the distressed $85 million level offered by Vector in recent discussions." The other companies would then refinance the residual amount due to the lenders.

34.     Apparently, this message was not warmly received. That same day, the lenders consummated the Seventh Amendment to the Credit Agreement, which contained onerous terms.[56] Among other things, the Debtors: (a) became obligated on an incremental 1% fee payable on each of April 1, 2014, July 1, 2014, and October 1, 2014, as well as a 2% PIK fee; (b) became obligated to execute a restructuring term sheet acceptable to Bayside fourteen days after receipt of a draft from Bayside; (c) became obligated to engage a Chief Restructuring Officer "satisfactory" to Bayside; (d) became obligated for Bayside's future legal fees; and (e) were prohibited from engaging bankers and other advisors unless proposed compensation was less than $100,000 or unless otherwise approved by Bayside (apparently, the terms of PJSC's restated engagement bore such approval).

35.     Moreover, on January 30, 2014, Bayside's counsel sent a letter addressed to the Board of Directors.[57] The letter advised that, in light of the Debtors' financial situation, "the fiduciary duties of the Company's officers and the members of its Board now extend to the Company's creditors, including Bayside." It then declared that the Board is "now required to take all appropriate actions including, without limitation, implementing the modest safeguards requested in this letter". Those "safeguards" included several "demands" by Bayside. The

---

[56]     See Exhibit R (DOLAN00000554-572).

[57]     See Exhibit S (DOLAN00017502-17505).

Redacted using Redact-It

"demands" included the creation of a Special Committee of the Board, to which Bayside

indicated who could and who could not be appointed.  They also included that the Bayside-

approved CRO shall:

> (i) have sole authority over the overall Restructuring of the Company, (ii) have
> sole authority over any sales process involving any of the Company including, for
> the avoidance of doubt, any communications with unsolicited potential buyers or
> otherwise, (iii) have sole authority over the management of discoverReady LLC,
> (iv) report solely to the Special Committee, and (v) have sole authority and
> approval rights over any dissemination of information by the Company to any
> Lender, Participant or Sub-Participant (each as defined in the Credit Agreement)
> or prospective Lender, Participant of Sub-Participant, or potential buyer.

36.      In this way, Bayside assumed supremacy over corporate governance.[58] And, to

ensure the gravity of the message and that it was not to be misinterpreted, the letter concluded

with a threat of legal action (to be paid for by the Debtors, per the Seventh Amendment): If the

Board did not accede to all such "demands," Bayside "reserve[d] the right to take all appropriate

actions."  By this point, the Debtors' bankruptcy was still nearly two months into the future.

37.      By mid-February, the Board had acceded to Bayside's "demands," having

established the stipulated corporate governance structures and ceded full control of the

restructuring to Mr. Nystrom.[59] Internal efforts also were well underway towards creation of

new projections and other evidence necessary for Plan confirmation.[60] Regardless, on February

13, in connection with the Eighth Amendment, Bayside imposed the following additional

---

[58]      A lender's actions give rise to potential estate liability when it "exercises such control over the
decision-making processes of the debtor as amounts to a domination of its will."  In re Advance
Nanotech, Inc., 2014 WL 1320145 *3 (Bankr. D. Del. Apr. 2, 2014) (Walrath, Bankr. J) (quoting
In re Teltronics Servs., Inc., 29 B.R. 139, 170 (Bankr. E.D.N.Y. 1983)); see also Edgewater
Growth Capital Partners LP v. H.I.G. Capital, Inc., 68 A.3d 197, 229 (Ch. Del. 2013) (Strine,
Ch.) ("In Delaware, . . . a creditor owes fiduciary duties to the company's stockholders [when] a
creditor exert[s] control over a  majority of a company's board of directors . . . .") (internal
citations and quotations omitted).

[59]      See Exhibit K (DOLAN00003604); Exhibit T (DOLAN00003523).

[60]      See Exhibit T (DOLAN00003523).

Redacted using Redact-It

obligations: (a) the Debtors must execute a full restructuring agreement by February 20, 2014; and (b) the Bank Debt would be increased by a 5% PIK fee.  Given that the Debtors had already acceded to Bayside's strategic demands, and that the takeover was already well in process, the PIK fee appears only to have been artifice designed to materially raise the "claim hurdle" for any stockholder considering Plan opposition.

      **E.**      **Kevin Nystrom Becomes Chief Restructuring Officer; The Debtors Produce New Projections; Plan Votes Are Solicited; And PJSC Receives The Pre-Petition Bonus.**

38.    Because Bayside would not consent to his appointment, Michael Knight never became Chief Restructuring Officer.[61]  On December 31, 2013, Bayside-approved candidate, Kevin Nystrom, assumed the CRO position.  His responsibility thereafter included interfacing with Bayside.  By mid-March, Mr. Nystrom was sufficiently comfortable with Bayside's Sean Britain that he could report in a manner suggesting that his fidelity belonged more to Bayside than to the corporate governance structure then in place: "I am slightly worried the Board and Jim [Dolan] do something stupid."[62]

39.    Just as Mr. Savini's job became the preparation of "backup work and opinions on valuation" necessary to effectuate the Bayside takeover, Mr. Nystrom's job became overseeing the creation of new projections to further that same goal.[63]  It appears that, in doing this assignment, Mr. Nystrom did not rely on normal operating projections created in the ordinary course of business.  Rather, he oversaw the creation of new projections.  For example, projections prepared under his control for the Business Information unit bear little resemblance to projections created by that unit in or around late fall 2013 for purposes of "good will"

---

[61]    See Exhibit K (DOLAN00003603-0606).

[62]    See Exhibit U (BYSD00001134-1137).

[63]    See Exhibit T (DOLAN00003523).

Redacted using Redact-It

impairment testing:   Mr. Nystrom's projections are, by comparison to the September 2013 Business Information Projections, shorter in duration by two and a half years, and project much weaker cash flows and operating margins.

40.    On March 18, 2014, the Plan and Disclosure Statement were disseminated to holders of Bank Debt for vote.  Not surprisingly, the vote carried.  PJSC then received the promised $750,000 restructuring fee.[64]

41.    Also on March 18, 2014, Mr. Dolan's employment as Chief Executive Officer and Mr. Pollei's employment as Chief Operating Officer were terminated.[65]  Under the terms of their Separation Agreements, Messrs. Pollei and Dolan received combined severance payments of $1.5 million.[66]  The Separation Agreements contained both market standard confidentiality provisions and market atypical non-disparagement provisions; the non-disparagement provisions disabled either gentleman from publicly disclosing any of the case circumstances described in this Objection.[67]

**IV.    Future BAC Work Flow.**

42.    As indicated above, for a full year, BAC has expressed concerns over the Debtors' leveraged situation, but has not terminated the customer relationship.  Though BAC placed DiscoverReady on new work holds, it subsequently relieved those holds.  As noted above, during the M&A process, BAC warned DiscoverReady it was at risk of losing the co-location

---

[64]    See *Debtors' Application for Entry of an Order (A) Authorizing the Employment and Retention of Peter J. Solomon Company, L.P. as Investment Banker Effective Nunc Pro Tunc to the Petition Date, (B) Waiving Certain Timekeeping Requirements Pursuant to Local Rule 2016-2(H), and (C) Granting Related Relief* [Docket No. 107] ¶ 28.

[65]    See *Debtors' Motion For Entry Of An Order (A) Authorizing The Rejection Of The Employment Agreements And The Separation Agreements, (B) Approving The Settlements With The Former Executives, And (C) Granting Related Relief*, [Docket No. 292] Exhibits F (Mr. Dolan Separation Agreement), G (Mr. Pollei Separation Agreement).

[66]    See id.

[67]    See id.

21

agreement if the Debtors did not consummate a deveraging transaction by December 12, 2013; December 12th came and went without a termination of that opportunity.  Several months later, in DiscoverReady's mid-March 2014 "flash report," unit management reported that the co-location "opportunity remains alive pending a public announcement that DiscoverReady is financially sound."[68]

43.     So, by this point in the process, what is the real forecast for future BAC work?  It seems that, recently, BAC has actually increased DiscoverReady's workload.  On May 16, 2014, the Equity Committee took the deposition of John Ritter, DiscoverReady Chief Operating Officer, which included the following questions and answers:

> Q.     And since that conversation, was there in fact a reduction in the amount of business on the technology side that was given to DiscoverReady by Bank of America?
>
> A.     There was definitely a decline in technology services work between -- in origination and then ultimately actual work between July and, frankly, it kind of persisted with -- you know, you take on a little bit of work here and there, but for the most part it persisted through until about April, we started to take on more work.[69]
>
> Q.     And we're going to come back to the April – the issues of more recent business later.  But can you quantify in any way the amount of decline that took place between the time of your conversation with Mr. Blair and call it April of 2014 when the business started to pick up again?
>
> A.     I don't recall when I had that conversation with Mr. Blair specifically.  And it was probably more than one.  But I would – I know that we did something close to 40 terabytes of work in the first six months of last year, and we didn't do – you know we didn't do a fraction of that in the second half.  I know – I have more recent memory of we were doing between 1, 1 and a half, not quite 2 terafor the bank between January, February, and March.  And then in April, we went back to levels that we had seen at the beginning of last year, which were 6 to 8 terabytes of work a month.[70]

---

[68]     See Exhibit V (DOLAN00009775).

[69]     See May 16, 2014 Dep. J. Ritter at 43-44.

[70]     Id. at 44-45.

Redacted using Redact-It

44.    It also bears noting that BAC affiliate, Bank of America, N.A., has at all relevant times been a holder of the Bank Debt.  It remains so today.  It is probative that an affiliate of BAC, presumably aware of BAC's methods and approaches, remains willing to accept the credit risk at this stage of the restructuring process.

## LEGAL ARGUMENT

**I.      The Plan Should Not Be Confirmed Because The
          Debtors Cannot Carry Their Burdens Of Proof And Persuasion.**

45.    The Debtors bear the burdens of proof and persuasion regarding all confirmation obligations under Section 1129.  See In re Armstrong World Indus., 348 B.R. 111, 120 & n.15 (D. Del. 2006) (plan proponent must establish by preponderance of the evidence the satisfaction of requirements of both Bankruptcy Code Section 1129(a) and 1129(b)); 7 Collier on Bankruptcy ¶ 1129.05[41][d] (16th ed. rev. 2014) ("At the [confirmation] hearing, the proponent bears the burdens of both introduction of evidence and persuasion that each subsection of section 1129(a) has been satisfied. . . .  If nonconsensual confirmation is sought, the proponent of such a plan will have to satisfy the court that the requirements of section 1129(b) are also met.  In either situation, the plan proponent bears the burden of proof by a preponderance of the evidence."). The Debtors cannot carry these burdens.

**A.    The Plan Should Not Be Confirmed Because It Does
        Not Meet The "Good Faith" Requirement Of Section 1129(a)(3).**

46.    The Court may confirm a plan only if it "has been proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  "The good faith standard requires that the plan be 'proposed with honesty, good intentions and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'"  In re Coram Healthcare Corp., 271 B.R. 228, 234 (Bankr. D. Del. 2001)

Redacted using Redact-It

(quoting In re Zenith Elecs. Corp., 241 B.R. 92, 107 (Bankr. D. Del. 1999).  Indeed, "[t]he burden of proposing a plan that satisfies the requirements of the [Bankruptcy] Code always falls on the party proposing it, but it falls particularly heavily on the debtor-in-possession or trustee since they stand in a fiduciary relationship to the estate's creditors."  Everett v. Perez (In re Perez), 30 F.3d 1209, 1214 n.5 (9th Cir. 1994).

47.     The touchstones "good faith," "honesty," "good intentions" all envelope a notion of fair play and judicial comfort that those who negotiated on behalf of the Debtors were enabled to fully acquit their fiduciary responsibilities to the corporation and its stakeholders.  Stated in the inverse, where circumstance suggests ulterior motive or lender over-reaching infected the debtor's corporate decision-making, a Section 1129(a)(3) finding cannot be made. See, e.g., In re Quigley Co., 437 B.R. 102, 127-28 (Bankr. S.D.N.Y. 2010) (plan proposed with ulterior motive of shielding non-debtor affiliate from liability not proposed in good faith); In re Bush Indus., 315 B.R. 292, 304, 305 (Bankr. W.D.N.Y. 2004) (explaining that section 1129(a)(3) "speaks more to the process of plan development than to the content of the plan . . . .  [It] imposes a strict mandate for proper process and methodology."); In re Coram Healthcare, 271 B.R. 228 (plan not confirmable because of close connection between senior executive and secured creditor).

48.     Here, the Plan is the final step in a "hostile" takeover, compelled by Bayside.  The evidence so far delivered to the Equity Committee establishes that the Debtors did not wish to proceed in this manner, as evidenced by the January 7th Board Letter.  That letter prompted a swift and harsh response by Bayside: (a) a heavy economic tax; (b) default waiver conditioned on the Debtors' prompt agreement to the takeover; (c) the Debtors' assumption of Bayside's legal fees and, shortly thereafter, a stern warning of legal action against each member of the Board; (d) emphatic "demand" that the newly replaced, Bayside-approved CRO be vested with

Redacted using Redact-It

"sole authority over the overall [r]estructuring of the Company;" and (e) eventually, the termination of the Company's senior-most executives who, presumptively, had opposed the takeover.   Moreover, the apparent confidence shared between CRO Kevin Nystrom and Bayside's Sean Britain, as well as the nature of the projections prepared under his control, all suggest that Mr. Nystrom subordinated his corporate fidelity to his relationship with Bayside. Finally, Mr. Savini's highly unusual compensation structure, affording him a pre-petition bonus of $750,000 for delivering the evidence (akin to a "fairness" opinion) required to support Bayside's intended plan, as well as the results-oriented nature of his valuation work, all suggest that he was more an agent for Bayside than an honest fiduciary advisor to the Debtors.

49.     The Plan was not proposed in good faith in accordance with Section 1129(a)(3). It should not be confirmed.

> **B.      The Plan Should Not Be Confirmed Because it Does Not Meet The "Fair And Equitable" Requirement Of Section 1129(b).**

50.     It is well settled that a plan is not "fair and equitable" for Section 1129(b) purposes if it over-compensates a senior class to the detriment of a junior class. See, e.g., In re Penn Cent. Transp. Co., 596 F.2d 1102, 1110 (3d Cir. 1979) ("[A] plan is not 'fair and equitable' unless it provides participation for claims and interests in complete recognition of their strict priorities, and unless the value of the debtor's assets supports the extent of the participation afforded each class of claims or interests included in the plan."); New England Coke & Coal Co. v. Rutland R. Co., 143 F.2d 179, 186 (2d Cir. 1944) ("A plan may be feasible and yet be not fair and equitable . . . if a  reorganization plan . . . with assets worth $15,000,000 and debts of $11,500,000, were to provide for the issuance of nothing but common stock having an aggregate par value of $10,000,000, all to be distributed to the old creditors, the plan would clearly be feasible . . . but it would be wanting in fairness."); In re Exide Techs., 303 B.R. at 61 ("[A]

Redacted using Redact-It

corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims."); In re Genesis Health Ventures, Inc., 266 B.R. 591, 612 (Bankr. D. Del. 2001) ("A corollary of the absolute priority rule is that a senior class cannot receive more than full compensation for its claims.") (same); In re MCorp Fin., Inc., 137 B.R. 219, 235 (Bankr. S.D. Tex. 1992) ("for a plan to be confirmed when stockholders are eliminated, creditors must not be provided for more than in full."); In re Future Energy Corp., 83 B.R. 470, 495 n. 39 (Bankr. S.D. Ohio 1988) ("Clearly, overpayment of senior creditors is violative of the fair and equitable standard."); In re Walat Farms, Inc., 70 B.R. 330, 335 (Bankr. E.D. Mich. 1987) (noting that it "would do violence to the 'fair and equitable' standard by paying [the creditor] more than its claim"); see also 7 Collier on Bankruptcy ¶ 1129.04[4][a] ("'[F]air and equitable' can be seen to have two key components: the absolute priority rule; and the rule that no creditor be paid more than it is owed.").

51.     The Plan violates this fundamental principle: It overcompensates Bayside and other lenders by affording them reorganized Debtor stock having an inherent value far exceeding the allowable amount of their debt.  As indicated above, Mr. Savini's valuation is unsustainable, for the following reasons:

- **Projections: Normalization.** The valuation relies on projections that are only two and a half years, without normalization.  The result is that residual business impacts of the Debtors' financial troubles are embedded in the DCF terminal value and, thus, modeled as a constant "in perpetuity."  This is inconsistent with governing legal principles and fundamental valuation theory.  See, e.g., Consolidated Rock, 312 U.S. at 526 (holding that valuation must be based on cash flows "freed from the heavy hand of past errors, miscalculations or disaster"); Cox Enters., Inc. v. News-Journal Corp., 510 F.3d 1350, 1358-59 (11th Cir. 2007) (appropriate to "normalize" future earnings and operating margins to reflect the changing nature of the business); Chartwell Lit. Trust v. Addus Healthcare, Inc. (In re Med Diversified, Inc.), 346 B.R. 621, 640-41 (Bankr. E.D.N.Y. 2006) (disqualifying an expert for, among other things, failing to normalize cash flows); Orchard Enters., Inc., 2012 WL 2923305, at *15 ("The petitioners' challenge is grounded in the sound valuation principle that because the terminal value is meant

Redacted using Redact-It

to capture the present value of all future cash flows of the company, typically the net cash flow figure used to generate the terminal value should be normalized, rather than unrealistically extrapolate a company's short run circumstances into perpetuity." (citation omitted)).

- **Projections: Purposed For Litigation.** Unlike the September 2013 Business Information Projections, the projections created under Mr. Nystrom's control were purposed specifically for litigation (this confirmation contested matter). Mr. Nystrom's projections are comparatively short and markedly dour. Mr. Savini did not adjust to remediate in any way. See In re Nellson Nutraceutical, Inc., 2007 Bankr. LEXIS 99, at *4 (Bankr. D. Del. Jan. 18, 2007) (concluding that the projections were "manipulated at the direction of an in cooperation with the Debtors' controlling shareholder to bolster the perceived value of the Debtors' business solely for purposes of this litigation."); see also Hon. Christopher S. Sontchi, Valuation Methodologies: A Judge's View, 20 Am. Bankr. Inst. L. Rev. 1, 9 n.13 (2012) (care must be given because "projections may be manipulated by management to favor its interests or those of others 'friendly' to management."); Stuart C. Gilson, Edith S. Hotchkiss & Richard S. Ruback, Valuation of Bankruptcy Firms, 13-1 Rev. Fin. Stud. 43 (2000) (cited in In re Exide Techs., 303 B.R. at 60) (showing management propensity to undervalue businesses when restructuring arranged with secured lenders).

- **Projections: Anticipated BAC Work.** The projections also do not reflect the likely resumption of work volume historically commissioned by DiscoverReady's largest customer, BAC. This ignores evidence that the work has already returned and likely will continue in the future. See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson, 390 U.S. 414, 444 (1968) (district court erred in confirming plan because it "did not have before it all of the evidence and testimony relating to the future . . . prospects of the company which were necessary to assess its value as a going concern."); In re Mirant Corp., 334 B.R. 800, 816 (Bankr. N.D. Tex. 2005) (relying on methodologies "likely to ensure that Mirant Group is valued based on the worth of its future ability to produce income."); Bush Indus., 315 B.R. at 299 ("[T]he appropriate valuation of Bush Industries is to be grounded upon its earning capacity as a reorganized entity."); In re Exide Techs., 303 B.R. at 65-66 ("Modern finance has caught up with the Supreme Court's directions in Consolidated Rock by providing Courts with valuation methodologies that focus upon earning capacity.").

- **Comparable Transactions Analysis.** Mr. Savini did not utilize this valuation methodology, even though there have been more than 30 e-discovery M&A transactions since 2012. See Muoio & Co. v. Hallmark Entm't Invs. Co., 2011 WL 863007, at *20 (Del. Ch. Mar. 9, 2011) ("it is preferable to take a more robust approach involving multiple techniques – such as a DCF analysis, a comparable transactions analysis (looking at precedent transaction comparables), and a comparable companies analysis (looking at trading comparables/multiples) – to

Redacted using Redact-It

triangulate a value range, as all three methodologies individually have their own limitations.").

• **Adjusted CAPM Calculation: Equity Risk Premium.** Mr. Savini calculated the equity risk premium for his DCF analysis based on Ibbotson's "historical" rate (6.70%) instead of Ibbotson's "supply-side" rate (6.18%).  This is not supported by the case law or academic literature.  See Orchard Enters., Inc., 2012 WL 2923305, at *18-19 ("supply-side" as opposed to "historical" is the proper rate); Global FT LP v. Golden Telecom, Inc., 993 A.2d 497, 514-16 (Del. Ch. 2010)(Strine, Ch.), aff'd, 11 A.3d 214 (Del. 2010)(reviewing literature considering the choice between the two rates, concluding that the academic community has shifted toward greater support for the "supply-side" rate, and ultimately accepting same); Gearreald v. Just Care, Inc., 2012 WL 1569818, at *10 (Del Ch. Apr. 30, 2012)(finding that expert had provided "no persuasive substantive financial reason as to why the application of a supply side equity risk premium would be inappropriate."); see also Ibbotson SBBI 2010 Valuation Yearbook, Market Results for Stocks, Bonds, Bills, and Inflation 1926-2009 at 64 ("over the long run, equity returns should be close to the long-run supply estimate.").

• **Adjusted CAPM Calculation: Firm Size Premium.** Mr. Savini determined the firm size premium for his DCF analysis by reference to the very highest number found in Ibbotson's 10th decile range (11.65%) instead of the company average within the range (5.99%).  This is unreasoned.  The highest discount in the Ibbotson 10th decile range pertains to "highly leveraged companies with small-market capitalizations that probably do not match the characteristics of financially healthy but small companies," "companies with no sales . . . (e.g., speculative start-ups)," or "stocks of troubled companies . . . trading like call options." Shannon P. Pratt & Roger J. Grabowski, Cost of Capital: Applications and Examples 268 (4th ed. 2010).  The Debtors will, however, emerge from bankruptcy with a substantially deleveraged balance sheet and, thus, with a far stronger business profile than that described by Messers. Pratt and Grabowski.

• **Surrounding Datapoints.** Mr. Savini ignores a  variety of datapoints, each strongly suggesting that his valuation (mid-point, $118.5 million) is incorrect: (a) the Mesirow valuation of $248.1 million; (b) William Blair's targeted return for DiscoverReady at $150 million, nearly triple Mr. Savini's appraisal; (c) M&A initial indications of interest (before the process soured) between $205 and $235.6 million; (d) second round M&A bidding included a DiscoverReady bid of $103 million, nearly double Mr. Savini's appraisal; (e) one "firm" bid for DiscoverReady that was approximately $25 million more than Mr. Savini's appraisal; (f) the September 2013 Business Information Projections and the January 7th Board Letter; (g) business units comprising "Reorganized Dolan" (Counsel Press and Business Information) to emerge from bankruptcy with exit debt totaling $2.5 million more than Mr. Savini's valuation of those units; and (h)

Redacted using Redact-It

███████████████████████████████████, and Bayside assuredly did not acquire such debt intending a zero-sum or negative arbitrage. See In re Carmania Corp. N.V., 156 B.R. 119, 125 (Bankr. S.D.N.Y. 1993) (rejecting valuation expert's "skewed, unrealistic assumptions" that were inconsistent with other "objective" case evidence).

52.    The Goldin Valuation Report concludes that the Debtors' businesses are worth between $191.9 million and $236.1 million, with a $211.8 million mid-point.  In reaching these conclusions, the Goldin Valuation Report: (a) extends the Debtors' projections to December 2019, incorporating relevant business data (from the September 2013 Business Information Projections) not created for litigation purposes, and also contemplates eventual return to pre-restructuring margins; (b) uses the "supply-side" equity risk premium in accordance with the relevant case law and literature; (c) calculates the firm size premium by averaging the companies in Ibbotson's 10th decile, thus giving due acknowledgment of the deleveraging impact of bankruptcy; (d) includes a "Comparable Transactions" analysis, given the volume of M&A activity in the e-discovery space since 2012; and (e) considers surrounding case circumstance and other indicia of value.  The Goldin Report establishes that the Plan short-changes stockholders by tens of millions of dollars.

53.    The Plan is not "fair and equitable" respecting stockholders and, therefore, violates Section 1129(b).  It should not be confirmed.

## II.    The Parties Should Be Directed to Judicial Mediation To Facilitate Prompt Negotiation Of A Fully Consensual Plan.

54.    The Equity Committee has no desire to prolong the Debtors' Chapter 11 experience.  It seeks only a fair allocation of estate value and a proper case conclusion, achieved as quickly as possible.  From inception, the Equity Committee has been willing to negotiate and, in fact, promptly following appointment, invited the Debtors and Bayside to the bargaining table.  Those invitations, however, were not accepted.  The Equity Committee believes that, following

Redacted using Redact-It

denial of confirmation, this case is a good candidate for judicial mediation. The Equity Committee commits to participate meaningfully in any such mediation, and bargain in good faith towards the prompt development of a fully consensual plan of reorganization.

## CONCLUSION

**WHEREFORE**, for the reasons stated herein, the Equity Committee respectfully requests that this Court: (a) sustain this Objection; (b) deny confirmation of the Plan; (c) order the parties to mediation; and (d) grant to the Equity Committee such other and further relief as is just and proper.

Dated: May 19, 2014
    Wilmington, Delaware

              Respectfully submitted,

              **BAYARD, P.A.**

              */s/ Justin R. Alberto*
              Neil B. Glassman (No. 2087)
              GianClaudio Finizio (No. 4253)
              Justin R. Alberto (No. 5126)
              222 Delaware Avenue, Suite 900
              Wilmington, Delaware 19899
              Telephone: (302) 655-5000
              Facsimile: (302) 658-6395

                 - and -

              **BROWN RUDNICK LLP**
              Robert J. Stark (admitted *pro hac vice*)
              Andrew Dash (admitted *pro hac vice*)
              Steven B. Levine (admitted *pro hac vice*)
              Seven Times Square
              New York, New York 10036
              Telephone: (212) 209-4800
              Facsimile: (212) 209-4801

              *Proposed Co-Counsel for the Official*
              *Committee of Equity Security Holders of The*
              *Dolan Company, et al.*

Redacted using Redact-It